# EXHIBIT A

# ▰MCC  APPLIED MICRO CIRCUITS CORP (AMCC)

215 MOFFETT PARK DRIVE
SUNNYVALE, CA 94089
858. 450.9333
http://www.amcc.com/

## 10-K

FORM 10-K
Filed on 01/10/2007 – Period: 03/31/2006
File Number 000-23193



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended March 31, 2006
OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____
Commission file number: 000-23193

## APPLIED MICRO CIRCUITS CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-2586591** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **215 Moffett Park Drive, Sunnyvale, CA** | **94089** |
| (Address of principal executive offices) | (zip code) |

Registrant's telephone number, including area code: (408) 542-8600

Securities registered pursuant to Section 12(b) of the Act: None
Securities registered pursuant to Section 12(g) of the Act:
Common Stock, $0.01 par value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐  No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐  No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act

Large accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).   Yes ☐  No ☒

The aggregate market value of the voting common stock held by non-affiliates of the registrant, based upon the closing sale price of the Registrant's common stock on September 29, 2006 as reported on the Nasdaq Global Select Market, was approximately $810,670,838. Shares of common stock held by each officer and director and by each person who owns 10% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

There were 281,826,071 shares of the registrant's Common Stock issued and outstanding as of December 31, 2006.

Table of Contents

# APPLIED MICRO CIRCUITS CORPORATION
## ANNUAL REPORT ON FORM 10-K
## FOR THE FISCAL YEAR ENDED
## MARCH 31, 2006
### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Cautionary Statement About Forward-looking Statements | | 1 |
| Explanatory Note | | 1 |

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 7 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 35 |
| Item 2. | Properties | 35 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 36 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. | Selected Financial Data | 38 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 44 |
| Item 7A. | Quantitative and Qualitative Disclosure about Market Risk | 68 |
| Item 8. | Financial Statements and Supplementary Data | 69 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 69 |
| Item 9A. | Controls and Procedures | 69 |
| Item 9B. | Other Information | 74 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 74 |
| Item 11. | Executive Compensation | 78 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 85 |
| Item 13. | Certain Relationships and Related Transactions | 88 |
| Item 14. | Principal Accountant Fees and Services | 88 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 90 |
| Signatures | | 93 |
| Financial Statements | | F-1 |

Table of Contents

## CAUTIONARY STATEMENT ABOUT FORWARD-LOOKING STATEMENTS

All statements included or incorporated by reference in this report, other than statements or characterizations of historical fact, are forward-looking statements. These forward-looking statements are made as of the date of this report. Any statement that refers to an expectation, projection or other characterization of future events or circumstances, including the underlying assumptions, is a forward-looking statement. We use certain words and their derivatives such as "anticipate", "believe", "plan", "expect", "estimate", "predict", "intend", "may", "will", "should", "could", "future", "potential", and similar expressions in many of the forward-looking statements. The forward-looking statements are based on our current expectations, estimates and projections about our industry, management's beliefs, and other assumptions made by us. These statements and the expectations, estimates, projections, beliefs and other assumptions on which they are based are subject to many risks and uncertainties and are inherently subject to change. We describe many of the risks and uncertainties that we face in the "Risk Factors" section in Item 1A and elsewhere in this report. We update our descriptions of the risks and uncertainties facing us in our periodic reports filed with the U.S. Securities and Exchange Commission, known as the "SEC", in which we report our financial condition and results for the quarter and fiscal year to date. Our actual results and actual events could differ materially from those anticipated in any forward-looking statement. Readers should not place undue reliance on any forward-looking statement.

In this annual report on Form 10-K, "Applied Micro Circuits Corporation", "AMCC", the "Company", "we", "us" and "our" refer to Applied Micro Circuits Corporation and all of our consolidated subsidiaries.

## EXPLANATORY NOTE

Our Audit Committee has completed a review of our stock option granting practices and accounting. Based on the results of this review, we have concluded that the accounting measurement dates under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), for certain stock option grants awarded during the fiscal years ended March 31, 1999, 2000, 2001 and 2002 differ from the measurement dates previously used to determine any stock-based compensation expense during the six fiscal years ended March 31, 2004 and have determined that we should have recognized approximately $95.2 million of stock-based compensation expense that was not accounted for in our previously issued financial statements. Therefore, we have concluded that our previously issued financial statements and all financial press releases and similar communications issued by us for the periods beginning with the fiscal year ended March 31, 1999 should not be relied upon. We do not intend to amend our previously filed annual reports on Form 10-K for these fiscal years.

We are restating in this report the financial information for each of the fiscal years ended March 31, 1999, 2000, 2001 2002, 2003 and 2004. This report includes cumulative restatements of our stockholders' equity for these years and the restatement of our consolidated balance sheet as of March 31, 2005. The restatement had no impact on our previously reported cash balances or revenues.

As a result of our failure to file this report and subsequent quarterly reports on a timely basis, we will not be eligible to use Form S-3 to register our securities with the SEC until all reports required under the Securities Exchange Act of 1934 have been timely filed for at least 12 months.

The grants giving rise to the $95.2 million in additional stock-based compensation expense are summarized below:

1) For five grants to executives that were approved by unanimous written consents ("UWCs") signed by the members of the Compensation Committee, we could not find evidence of an approval of the grants on or before the dates for which we set the exercise price of the options. Also, the signatures on the UWCs were not dated. As a result, the final approval and the new measurement date of each grant were deemed to be the date that we received the last signed UWC counterpart via fax. Three of these grants were executive

1

Table of Contents

promotion grants for which we set the exercise price as the closing price on dates following the date of the executive's promotion. In each case, the exercise price was the lowest closing price for any date between (and including) the executive's promotion date and the date the last UWC counterpart was received back from the Compensation Committee. Our practice at the time was to set the exercise price as the closing price on the employee's promotion date. These five grants accounted for approximately $3.4 million of the $95.2 million.

2) For one all-employee refresh grant, the "employee allocations" i.e. the number of options to be granted to each individual employee, were not finalized until nine days after the grant was approved by the Compensation Committee. For this grant, we utilized the date the employee allocation list was finalized as the new measurement date. This grant accounted for approximately $1.0 million of the $95.2 million.

3) On one occasion, we set the exercise price for an option to an executive new hire prior to the date the executive began working as a full-time employee. This grant accounted for approximately $14.2 million of the $95.2 million. This grant was approved using the UWC signed by the Compensation Committee. The UWC counterparts were not received back until two months after the offer was accepted and one month after the executive began working as a full-time employee. We measured this grant using the date the last UWC counterpart was received back from the Compensation Committee. The exercise price of this grant was originally set lower than the closing price on the date the employee began employment and was also lower than the closing price on the new measurement date. This grant is in addition to the five grants mentioned above in the first category.

4) On two occasions, we granted options (to both executives and non-executive employees) with exercise prices equal to the closing price of our common stock on the date before the grant was approved. Our predominant practice was to use the closing price on the day of the grant. Upon review, we concluded that the appropriate measurement date was on the date of the grant. These grants accounted for approximately $27.0 million of the $95.2 million.

5) For one all-employee refresh grant, the Compensation Committee appears to have permitted management to select the grant date and therefore the exercise price within a specified future time period (the "Open Period"). There is no evidence indicating that the grant date was selected prior to the last day of the Open Period. As a result, for accounting purposes, we have used a new measurement date equal to the last day of the Open Period. The exercise price was lower than the remeasured price at the end of the open period. This grant accounted for approximately $16.2 million of the $95.2 million.

6) For three grants to executives, eight grants to non-executives and a grant made in connection with an October 2000 acquisition, we concluded that management changed the exercise prices of the options after the option grants were approved, but before they were processed to take advantage of lower closing prices that occurred within a few days after the approved grant date. We have applied variable accounting to these awards, which accounted for approximately $33.5 million of the $95.2 million.

The facts and circumstances surrounding the six categories listed above have been, and continue to be, the subject of investigations by the Enforcement Division of the SEC and the United States Attorney's Office for the Southern District of California. The Company intends to fully co-operate in both investigations.

During the course of the investigation, the Audit Committee did not observe any other accounting issues of concern. In addition, at the conclusion of the investigation, the Audit Committee's advisors performed a key word email search for other accounting issues in the historical email records of key finance personnel and did not identify any issues of concern.

None of the members of the management team involved in the granting of options giving rise to the restatement is currently employed with or providing services to the Company. We found our current equity award processes and procedures are appropriate and provide effective controls.

2

Table of Contents

|  | Additional Stock–Based Compensation Expense by Category | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Total |
|  | | | | (in thousands) | | | |
| Category 1 | $   — | $   — | $  402 | $ 3,007 | $   — | $   — | $ 3,409 |
| Category 2 | — | — | — | 918 | 22 | 25 | 965 |
| Category 3 | — | 1,016 | 4,063 | 4,062 | 4,063 | 1,016 | 14,220 |
| Category 4 | — | 6,453 | 3,188 | 17,261 | 34 | 16 | 26,952 |
| Category 5 | — | — | — | 10,382 | 5,777 | — | 16,159 |
| Category 6 | 55 | 20,204 | 14,240 | (254) | (765) | — | 33,480 |
| Pre–tax stock–based compensation expense adjustments | 55 | 27,673 | 21,893 | 35,376 | 9,131 | 1,057 | 95,185 |
| Income tax benefit attributable to adjustments | — | 10,181 | 5,515 | 5,171 | — | — | 20,867 |
| Net impact | $    55 | $ 17,492 | $ 16,378 | $ 30,205 | $ 9,131 | $ 1,057 | $ 74,318 |

**Impact of Judgments and Interpretations on Restatement Values**

In calculating the amount of incremental stock–based compensation expense to record, we had to make certain interpretations and assumptions and draw certain conclusions from and regarding the internal investigation findings. There is the risk that the interpretations and assumptions we made could be disputed by others after the fact or that we did not draw the correct conclusions from the findings. There is a further risk that the investigation findings themselves were inaccurate or incomplete. All of these risks are particularly acute where there was incomplete documentation. Where we had incomplete documentation, we considered the guidance provided by the Office of the Chief Accountant of the SEC, pursuant to a letter dated September 19, 2006 (the "Chief Accountant's letter"). Specifically, we used all reasonably available relevant information to form reasonable conclusions as to the most likely option granting actions that occurred and the dates on which such actions occurred in determining the parameters of the restatement.

Incomplete documentation was an issue with respect to the grants described in categories 1, 3, 5 and the executive and acquisition grants described in category 6. Because we could find no clear and definitive documentation regarding when the grants were made, and in the case of the executive and acquisition grants in category 6, why the exercise price of these grants were set on a day other than the day they would be set under our established practice, we chose alternative dates as described above.

The lack of documentation was also an issue in determining the date on which employee grant allocations became fixed and final in the case of refresh grants (refresh grants are our annual or semi–annual grants to all employees, which usually but not always, included executives.) In cases where the documentation supporting the refresh grant allocations was not complete, we employed the guidance provided by the Chief Accountant's letter and used available documentation as well as other relevant and available facts to form reasonable conclusions as to the most likely option granting actions that occurred and the dates on which such actions occurred. From April 1997 to March 31, 2006, we had a practice of annual or bi–annual grants to all employees (usually including executives). In the case of the grant described in category 2, we concluded that the allocation list was not finalized until nine days after the approval date. As a result we remeasured the grant using the date the allocation list was determined to be final.

We had to make certain legal interpretations regarding, among other things, the requirements under Delaware law for the granting of stock options, the effectiveness of actions taken by our Board of Directors and certain of its committees, and the effectiveness and effect of UWCs. We also had to make a number of accounting interpretations, including interpreting various SEC accounting literature and applying those interpretations to our facts and circumstances. For example, for each category discussed above we had to interpret and apply APB 25 and related interpretations. Specifically, we had to make a determination of the correct measurement date which, under APB 25, is defined as "the first date on which are known both (1) the

3

**Table of Contents**

number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any." As previously noted, we also considered the guidance provided by the Chief Accountant's letter in making our determinations.

In the case of category 4, we had to interpret accounting guidance to determine the appropriateness of setting exercise prices for grants using the closing price on the day before the grant approval date. Among the factors we considered was the lack of consistency with which we followed our own practices in pricing grants (day of grant versus day before grant), which may have been employed to take advantage of a lower price within a two-day period.

In the area of legal interpretation, we had to determine the effective date of grants under our process for making new hire and promotion grants to non-executive officers. Under that process, grants were automatically made (and exercise prices set) on the Monday the employee commenced employment or was promoted (or the following Monday if the employment or promotion date was not a Monday). We determined that the effective date of these grants was the Monday on which the grants were automatically made notwithstanding the fact that the UWCs documenting the grant approval sometimes were not signed by the Stock Option Committee until a later date. This conclusion is consistent with the guidance provided in the Chief Accountant's letter with respect to the effect of inconsequential administrative delays. As discussed in category 6, we changed the exercise price after the options were automatically granted. We have treated these options as having been cancelled and re-granted, resulting in variable accounting.

Underlying the entire restatement are the investigation findings. We had to make numerous assumptions and conclusions in reviewing the evidence presented to us by the Audit Committee's outside counsel and forensic accountants, including assumptions regarding the veracity of witnesses; the intent behind the wording of certain documents, particularly informal communications such as emails; the date of undated documents; whether documents were received or read by the addressees and the state of mind of persons involved in the granting process. We believe that the Audit Committee and its representatives were thorough in their investigation, careful and measured in assisting us with our assumptions and conclusions. The process of reaching these conclusions was a collaborative process that involved the forensic accountants, the Audit Committee and the current management team. Despite the difficulty of dealing with imperfect data and the resulting judgments we were able to arrive at a collective conclusion.

Some judgments would have made the restatement higher and some would have made it lower. For example, in category 3 of the 6 categories that comprise the results of our stock option granting practices investigation, the executive's grant could have been evaluated based on his start date consistent with our practice. This would have lowered the $95.2 million aggregate expense by $7.9 million. In this case we ultimately used the date of the UWC as we could find no evidence of a meeting of the minds until the UWC was signed. Another example dealt with the 387 occasions where we made weekly grants. We repriced the eight exceptions noted but if we had used the UWC signature dates as the measurement dates, we would have recognized no compensation cost for the eight and for the other 379 grants we would have recognized an estimated additional $15.4 million of stock-based compensation expense. Not all of the categories present possible ranges of compensation cost as demonstrated by category 2, where the allocation list was not finalized until a later date and the later date was the only viable measurement date. In addition to the judgment applied to the six categories which ultimately resulted in the recording of stock-based compensation, there were other potential issues identified which did not result in the recording of compensation, such as the use of UWC's by the stock option committee. We did not assess a possible range of exposure on these items, as we concluded the appropriate grant date had been used originally. A review or assessment of the judgments and interpretations applied to the various items resulted in a possible range of compensation cost of $58.3 million to $144.8 million, with our final conclusion resulting in $95.2 million in additional expense.