# Exhibit A

# APPLIED MICRO CIRCUITS CORP

## FORM DEF 14A
### (Proxy Statement (definitive))

## Filed 7/11/2005 For Period Ending 8/23/2005

| | |
|---|---|
| Address | 6290 SEQUENCE DR |
| | SAN DIEGO, California 92121 |
| Telephone | 619-450-9333 |
| CIK | 0000711065 |
| Industry | Semiconductors |
| Sector | Technology |
| Fiscal Year | 03/31 |

Powered By EDGAR Online

http: www.edgar-online.com
© Copyright 2005 All Rights Reserved
Distribution and use of this document restricted under EDGAR Online's Terms of Use

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

### SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(a)
of the Securities Exchange Act of 1934
(Amendment No.   )**

Filed by the Registrant  ☒

Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under rule 14a-12

# Applied Micro Circuits Corporation
### (Name of Registrant as Specified In Its Charter)

#### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box)

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

## INVITATION TO 2005 ANNUAL MEETING OF STOCKHOLDERS

### DATE: Tuesday, August 23, 2005

### TIME: 10:00 a.m.

### PLACE: AMCC Corporate Headquarters
### 6290 Sequence Drive, San Diego, CA 92121

July 11, 2005

Dear Stockholders:

Please join me at our Annual Meeting on August 23, 2005, where we will ask you to elect our Board of Directors, approve an amendment to our employee stock purchase plan and vote on the ratification of the selection of our auditors.

In addition to the formal items of business, at our Annual Meeting I will review the major Company developments over the past year and share with you plans for our future. You will have the opportunity to ask questions and express your views to the senior management of your Company. Members of the Board of Directors will also be present.

Whether or not you are able to attend the Annual Meeting in person, it is important that your shares be represented. You can vote your shares using the Internet or a toll-free telephone number, or by completing and returning the enclosed proxy card by mail. Instructions on each of these voting methods are outlined in the Proxy Statement. Please vote as soon as possible.

Sincerely yours,

KAMBIZ HOOSHMAND
*President and Chief Executive Officer*

Table of Contents

# APPLIED MICRO CIRCUITS CORPORATION
### 6290 SEQUENCE DRIVE
### SAN DIEGO, CA 92121

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## TO BE HELD ON AUGUST 23, 2005

To the Stockholders of Applied Micro Circuits Corporation:

The annual meeting of stockholders of Applied Micro Circuits Corporation will be held at the principal executive offices of the Company located at 6290 Sequence Drive, San Diego, California on Tuesday, August 23, 2005, at 10:00 a.m., local time, for the following purposes:

  1.    To elect eight directors;

  2.    To approve an amendment to the 1998 Employee Stock Purchase Plan to increase the aggregate number of shares of Common Stock authorized for issuance under the plan by 8,000,000 shares.

  3.    To ratify the selection of Ernst & Young LLP as independent auditors of the Company for the fiscal year ending March 31, 2006; and

  4.    To conduct any other business properly brought before the meeting.

These items of business are more fully described in the proxy statement accompanying this notice.

The record date for the annual meeting is June 27, 2005. Only stockholders of record at the close of business on that date may vote at the meeting or any adjournment thereof.

By Order of the Board of Directors,

Jeffery A. Blazevich
Secretary

San Diego, California
July 11, 2005

## IMPORTANT

**YOU ARE CORDIALLY INVITED TO ATTEND THE MEETING IN PERSON. WHETHER OR NOT YOU EXPECT TO ATTEND THE MEETING, PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY, OR VOTE OVER THE TELEPHONE OR THE INTERNET AS INSTRUCTED IN THESE MATERIALS, AS PROMPTLY AS POSSIBLE IN ORDER TO ENSURE YOUR REPRESENTATION AT THE MEETING. A RETURN ENVELOPE (WHICH IS POSTAGE PREPAID IF MAILED IN THE UNITED STATES) IS ENCLOSED FOR YOUR CONVENIENCE. EVEN IF YOU HAVE VOTED BY PROXY, YOU MAY STILL VOTE IN PERSON IF YOU ATTEND THE MEETING. PLEASE NOTE, HOWEVER, THAT IF YOUR SHARES ARE HELD OF RECORD BY A BROKER, BANK OR OTHER NOMINEE AND YOU WISH TO VOTE AT THE MEETING, YOU MUST OBTAIN A PROXY ISSUED IN YOUR NAME FROM THAT RECORD HOLDER.**

## THANK YOU FOR ACTING PROMPTLY.

Table of Contents

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Questions and Answers about these Proxy Materials and Voting | 1 |
| Principal Holders of Common Stock | 5 |
| Security Ownership of Management and Directors | 6 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 7 |
| Proposal 1—Election of Directors | 8 |
| Proposal 2—Amendment to 1998 Employee Stock Purchase Plan | 11 |
| Equity Compensation Plan Information | 16 |
| Corporate Governance | 17 |
| Stockholder Communications with the Board of Directors | 18 |
| Governance and Nominating Committee Evaluation of Board Nominees | 19 |
| Board Meetings and Attendance | 20 |
| Board Committees | 21 |
| Report of the Compensation Committee | 23 |
| Compensation Committee Interlocks and Insider Participation | 25 |
| Report of the Audit Committee | 26 |
| Proposal 3—Ratification of Selection of Independent Auditors | 27 |
| Audit and Other Fees | 27 |
| Compensation of Directors | 28 |
| Compensation of Executive Officers | 29 |
| Summary Compensation Table | 29 |
| Option Grants in Last Fiscal Year | 31 |
| Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values | 32 |
| Employment, Severance and Change of Control Agreements | 33 |
| Certain Transactions | 35 |
| Performance Graph—Comparison of Five-Year Cumulative Total Return | 36 |
| Certain Matters Relating to Proxy Materials and Annual Reports | 37 |
| Other Matters | 37 |
| Appendix A—Charter of the Audit Committee | A-1 |

Table of Contents

# APPLIED MICRO CIRCUITS CORPORATION
### 6290 SEQUENCE DRIVE
### SAN DIEGO, CA 92121

### PROXY STATEMENT
### FOR ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD ON AUGUST 23, 2005

## QUESTIONS AND ANSWERS ABOUT THESE PROXY MATERIALS AND VOTING

**Why am I receiving these materials?**

Applied Micro Circuits Corporation (sometimes referred to as the "Company" or "AMCC") sent you this proxy statement and the enclosed proxy card because its Board of Directors is soliciting your proxy to vote at the 2005 annual meeting of stockholders. You are invited to attend the annual meeting, and we request that you vote on the proposals described in this proxy statement. You do not need to attend the meeting to vote your shares. You may simply complete, sign and return your proxy card or follow the instructions below to submit your proxy over the telephone or on the Internet.

The Company intends to mail this proxy statement and accompanying proxy card on or about July 11, 2005 to all stockholders entitled to vote at the annual meeting.

**What am I voting on?**

There are three matters scheduled for a vote:

- Election of eight directors;
- Amendment of the 1998 Employee Stock Purchase Plan to increase the aggregate number of shares available under the plan by 8,000,000 shares;
- Ratification of Ernst & Young LLP as independent auditors of the Company for its fiscal year ending March 31, 2006.

**Who can vote at the annual meeting?**

Only stockholders of record at the close of business on June 27, 2005 will be entitled to vote at the annual meeting. On this record date, there were 305,402,361 shares of common stock outstanding and entitled to vote.

**Am I a stockholder of record?**

If on June 27, 2005 your shares were registered directly in your name with the Company's transfer agent, Computershare Investor Services, LLC, then you are a stockholder of record.

**What if my AMCC shares are not registered directly in my name but are held in street name?**

If on June 27, 2005 your shares were held in an account at a brokerage firm, bank, dealer, or other similar organization, then you are the beneficial owner of shares held in "street name" and these proxy materials are being forwarded to you by that organization. The organization holding your account is considered the stockholder of record for purposes of voting at the annual meeting. As a beneficial owner, you have the right to direct that organization on how to vote the shares in your account.

1

Table of Contents

**If I am a stockholder of record of AMCC shares, how do I cast my vote?**

If you are a stockholder of record, you may vote in person at the annual meeting or vote by proxy using the enclosed proxy card, vote by proxy over the telephone, or vote by proxy on the Internet. The procedures for voting are fairly simple:

- To vote in person, come to the annual meeting, and we will give you a ballot when you arrive.

- To vote by proxy, simply complete, sign and date your proxy card and return it promptly in the envelope provided. If you return your signed proxy card to us before the annual meeting, we will vote your shares as you direct.

- To vote over the telephone, dial the toll-free phone number listed on your proxy card under the heading "Vote by Phone" using a touch-tone phone and follow the recorded instructions. You will be asked to provide the company number and control number from your proxy card. Your vote must be received by 11:59 p.m. Eastern Daylight Time on August 22, 2005 to be counted.

- To vote on the Internet, go to **http://www.proxyvote.com** to complete an electronic proxy card. You will be asked to provide the company number and control number from your proxy card. Your vote must be received by 11:59 p.m. Eastern Daylight Time on August 22, 2005 to be counted.

**We provide Internet proxy voting to allow you to vote your shares on-line, with procedures designed to ensure the authenticity and correctness of your proxy vote instructions. However, please be aware that you must bear any costs associated with your Internet access, such as usage charges from Internet access providers and telephone companies.**

No matter which procedure you choose, in the election of directors, you may either vote "For" all the nominees to the Board of Directors or you may withhold your vote from any nominee you specify. For Proposal 2, Proposal 3 and any other matter to be voted on at the meeting, you may vote "For" or "Against" or abstain from voting. Whether or not you plan to attend the meeting, we urge you to vote by proxy to ensure your vote is counted. You may still attend the meeting and vote in person if you have already voted by proxy.

**If I am a beneficial owner of AMCC shares, how do I vote?**

If you are a beneficial owner of shares held in street name, you should have received a proxy card and voting instructions with these proxy materials from the organization that is the record owner of your shares rather than from AMCC. Simply complete and mail that proxy card to ensure that your vote is counted. Alternatively, you may vote by telephone or over the Internet as instructed by that organization. To vote in person at the annual meeting, you must obtain a valid proxy from that organization. To request the requisite proxy form, follow the instructions from your broker included with these proxy materials or contact your broker.

**How are votes counted?**

Votes will be counted by the inspector of election appointed for the meeting, who will separately count "For" and "Withhold" and with respect to proposals other than the election of directors "Against" votes, abstentions and broker non-votes. Abstentions will be counted towards the presence of a quorum and the vote total for each proposal and will have the same effect as "Against" votes. A "broker non-vote" occurs when a stockholder of record, such as a broker, holding shares for a beneficial owner does not vote on a particular item because the stockholder of record does not have discretionary voting power with respect to that item and has not received voting instructions from the beneficial owner. Broker non-votes will be counted towards the presence of a quorum but will not be counted towards the vote total for any proposal.

2

Table of Contents

### How many votes are needed to approve each proposal?

- For the election of directors, the eight nominees receiving the most "For" votes (among votes properly cast in person or by proxy) will be elected.

- To be approved, Proposal 2 and Proposal 3 must receive a "For" vote from the majority of the shares present at the meeting or represented by proxy. If you "Abstain" from voting, it will have the same effect as an "Against" vote. Broker non-votes will have no effect.

### How many votes do I have?

On each matter to be voted upon, you have one vote for each share of common stock of the Company that you owned as of June 27, 2005.

### What is the quorum requirement?

A quorum of stockholders is necessary to hold a valid meeting. A quorum will be present if at least a majority of the outstanding shares are present at the meeting or represented by proxy. On the record date, there were 305,402,361 shares outstanding and entitled to vote. Thus 152,701,181 shares must be present at the meeting or represented by proxy to have a quorum.

Your shares will be counted towards the quorum only if you submit a valid proxy or vote at the meeting. If there is no quorum, a majority of the votes present at the meeting or represented by proxy may adjourn the meeting to another date.

### What does it mean if I receive more than one proxy card?

If you receive more than one proxy card, your shares are registered in more than one name or are registered in different accounts. Please complete, sign and return **each** proxy card to ensure that all of your shares are voted.

### What if I return a proxy card but do not make specific choices?

If you return a signed and dated proxy card without marking any voting selections, your shares will be voted "For" the election of all eight nominees for director, "For" the amendment to the 1998 Employee Stock Purchase Plan and "For" the ratification of Ernst & Young LLP as independent auditors of the Company. If any other matter is properly presented at the meeting, your proxy (one of the individuals named on your proxy card) will vote your shares using his or her best judgment.

### Can I change my vote after submitting my proxy?

Yes. You can revoke your proxy at any time before the final vote at the meeting. You may revoke your proxy in any one of three ways:

- You may submit another properly completed proxy card with a later date.

- You may send a written notice that you are revoking your proxy to the Secretary of the Company (Attn: Corporate Secretary, Applied Micro Circuits Corporation, 6290 Sequence Drive, San Diego, CA 92121).

- You may attend the annual meeting and vote in person. Simply attending the meeting will not, by itself, revoke your proxy. Remember that if you are a beneficial owner of AMCC shares and wish to vote in person at the annual meeting, you must obtain a valid proxy from your broker.

### How can I find out the results of the voting at the annual meeting?

Preliminary voting results will be announced at the meeting. Final voting results will be published in the Company's quarterly report on Form 10-Q for the second quarter of fiscal 2006, which ends September 30, 2005.

3

Table of Contents

**Who is paying for this proxy solicitation?**

We will pay for the entire cost of soliciting proxies. In addition to these mailed proxy materials, our directors and employees may also solicit proxies in person, by telephone, or by other means of communication. Directors and employees will not be paid any additional compensation for soliciting proxies. We may also reimburse brokerage firms, banks and other agents for the cost of forwarding proxy materials to beneficial owners.

**When are stockholder proposals due for next year's annual meeting?**

To be considered for inclusion in next year's proxy materials, your proposal must be submitted in writing by March 13, 2006, to the Secretary of the Company (Attn: Corporate Secretary, Applied Micro Circuits Corporation, 6290 Sequence Drive, San Diego, CA 92121). Stockholders wishing to submit proposals or director nominations that are not to be included in our proxy materials for next year's annual meeting must do so after April 25, 2006 but not later than May 25, 2006. You are also advised to review our Bylaws, which contain additional requirements about advance notice of stockholder proposals and director nominations.

4

Table of Contents

# PRINCIPAL HOLDERS OF COMMON STOCK

The following table sets forth the only persons who, to the knowledge of the Company, owned beneficially as of June 1, 2005, more than 5% of the outstanding shares of common stock:

| Name and Address | Number of Shares | Percent of Total(1) |
|---|---|---|
| Capital Group International, Inc.(2)<br>11100 Santa Monica Boulevard<br>Suite 1500<br>Los Angeles, CA 90025-3384 | 37,914,227 | 12.4% |
| FMR Corp.(3)<br>82 Devonshire Street<br>Boston, MA 02109 | 16,332,545 | 5.4% |

1. Applicable percentages are based on 305,431,146 shares of common stock outstanding on June 1, 2005.
2. According to a Schedule 13G filed with the Securities and Exchange Commission (the "SEC") on January 13, 2005 by Capital Group International, Inc. ("CGII"), CGII is the parent holding company of a group of investment management companies that hold investment power and, in some cases, voting power over these securities. The wholly owned subsidiaries of CGII which acquired these securities are (i) Capital Guardian Trust Company, (ii) Capital International Limited, (iii) Capital International S.A., (iv) Capital International Research and Management, Inc. dba Capital International, Inc.
3. According to a Form 13F filed with the SEC on May 18, 2005 by FMR Corp., funds managed by Fidelity Management & Research Company, Fidelity Management Trust Company and FMR Co., Inc. hold investment power and, in some cases, voting power over these securities.

5

Table of Contents

## SECURITY OWNERSHIP OF MANAGEMENT AND DIRECTORS

The following table shows the beneficial ownership, reported to the Company as of June 1, 2005, of AMCC common stock, including shares as to which a right to acquire ownership exists (by the exercise of stock options) within the meaning of Rule 13d-3(d)(1) under the Securities Exchange Act of 1934 (the "1934 Act"), of each director, each person to serve as the Chief Executive Officer during fiscal 2005 and the four other most highly compensated executive officers of the Company during fiscal 2005 and all directors and executive officers of the Company, as a group.

| Name(1) | Number of Shares (2) | Percent of Total (3) |
|---|---:|---:|
| David M. Rickey(4) | 8,015,418 | 2.6% |
| Roger A. Smullen, Sr.(5) | 2,866,907 | * |
| Ramakrishna R. Sudireddy(6) | 2,660,428 | * |
| Franklin P. Johnson, Jr.(7) | 1,916,932 | * |
| Thomas L. Tullie(8) | 1,717,025 | * |
| Arthur B. Stabenow(9) | 568,426 | * |
| Harvey P. White(10) | 422,500 | * |
| L. Wayne Price(11) | 262,500 | * |
| Faye Pairman(12) | 248,934 | * |
| Cesar Cesaratto(13) | 214,167 | * |
| Brian F. Wilkie(14) | 57,083 | * |
| David B. Wright(15) | 16,667 | * |
| Julie H. Sullivan(16) | 10,417 | * |
| Murray A. Goldman(17) | 2,083 | * |
| Kambiz Y. Hooshmand(18) | — | * |
| All executive officers and directors as a group (20 persons)(19) | 20,559,681 | 6.4% |

---

\*    Less than one percent.
(1)   The address for the executive officers and directors of the Company is: c/o Applied Micro Circuits Corporation, 6290 Sequence Drive, San Diego, CA 92121.
(2)   The persons named in this table have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them, subject to community property laws where applicable and except as indicated in the other footnotes to this table.
(3)   In computing the number of shares beneficially owned by a person and the percentage ownership of that person, shares of common stock subject to options held by that person that are exercisable within 60 days after June 1, 2005 are deemed outstanding. Such shares are not deemed outstanding for the purpose of computing the percentage ownership of any other person. Applicable percentages are based on 305,431,146 shares of common stock outstanding on June 1, 2005.
(4)   Mr. Rickey served as Chairman of the Board, President and Chief Executive Officer of the Company until March 20, 2005. Includes 101,460 shares of common stock owned by the David Rickey Trust and 7,727,500 shares of common stock issuable upon the exercise of vested options that are exercisable within 60 days of June 1, 2005.
(5)   Includes 546,885 shares of common stock issuable upon the exercise of vested options that are exercisable within 60 days of June 1, 2005.
(6)   Mr. Sudireddy's employment by the Company terminated on March 31, 2005. Includes 1,621,838 shares of common stock issuable upon the exercise of vested options that are exercisable within 60 days of June 1, 2005.
(7)   Includes 561,328 shares of common stock owned by the Johnson Revocable Trust and 712,500 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(8)   Mr. Tullie's employment by the Company terminated on June 17, 2005. Includes 1,454,393 shares of common stock issuable upon the exercise of vested options that are exercisable within 60 days of June 1, 2005.
(9)   Includes 312,500 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.

6

Table of Contents

(10)  Includes 412,500 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(11)  Includes 262,500 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(12)  Includes 248,934 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005
(13)  Includes 214,167 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(14)  Includes 57,083 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(15)  Includes 16,667 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(16)  Includes 10,417 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(17)  Dr. Goldman was elected to the Board of Directors on June 9, 2005 and was granted stock options upon his election. Includes 2,083 shares of common stock issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.
(18)  Mr. Hooshmand became President and Chief Executive Officer of the Company on March 21, 2005.
(19)  Includes 15,037,358 shares issuable upon the exercise of options that are exercisable within 60 days of June 1, 2005.

## SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the 1934 Act requires the Company's directors and executive officers, and persons who own more than ten percent of a registered class of the Company's equity securities, to file with the SEC initial reports of ownership and reports of changes in ownership of common stock and other equity securities of the Company. Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) forms they file.

To the Company's knowledge, based solely on a review of the copies of such reports furnished to the Company and written representations that no other reports were required during the fiscal year ended March 31, 2005, all Section 16(a) filing requirements applicable to its reporting persons were timely made except that Mr. Johnson inadvertently failed to file a Form 5 relating to the gift of shares by his spouse into their family's revocable trust.

7

Table of Contents

## PROPOSAL 1
## ELECTION OF DIRECTORS

The Board of Directors currently consists of ten directors. Two of the current directors, Franklin P. Johnson, Jr. and L. Wayne Price are not standing for re-election, and their terms will end at the annual meeting. Effective at the annual meeting, the number of directors will become eight pursuant to a resolution adopted by the Board of Directors in accordance with the Company's Bylaws and Certificate of Incorporation, and the stockholders will elect eight directors at the annual meeting. Nominees proposed for election as directors are listed below. Directors will hold office until the next annual meeting. Each of the nominees is now a member of the Board of Directors. Four of the nominees were elected by the stockholders at the last annual meeting. Mr. Wright, Dr. Sullivan, Mr. Hooshmand and Dr. Goldman were elected by the Board of Directors since the last annual meeting.

Directors are elected by a plurality of the votes properly cast in person or by proxy. The eight nominees receiving the highest number of affirmative votes will be elected. Shares represented by executed proxies will be voted, if authority to do so is not withheld, for the election of the eight nominees named below. If any nominee becomes unavailable for election as a result of an unexpected occurrence, your shares will be voted for the election of a substitute nominee selected by the Governance and Nominating Committee of the Board of Directors. Each person nominated for election has agreed to serve if elected. We have no reason to believe that any nominee will be unable to serve.

THE GOVERNANCE AND NOMINATING COMMITTEE OF THE BOARD OF DIRECTORS
RECOMMENDS A VOTE IN FAVOR OF EACH NAMED NOMINEE.

The following information was provided by the nominees:

**CESAR CESARATTO**
**Chairman of the Board**

| | |
|---|---|
| *Age:* | 57 |
| *Director Since:* | 2002 |
| *Principal Occupation:* | Development of start-up technology companies since May 2001 |
| *Recent Business Experience:* | Various executive positions with Nortel Networks Corporation spanning component and product development, operations, sales and marketing (from 1970 to May 2001). His most recent position was President Wireless Systems for Europe Middle East and Africa. |
| *Other Directorships:* | Gennum Corporation |
| *Committee Memberships:* | Chairman of the Governance and Nominating Committee, Member of the Compensation Committee |

**ROGER A. SMULLEN, SR.**
**Vice Chairman**

| | |
|---|---|
| *Age:* | 69 |
| *Director Since:* | 1982 |
| *Principal Occupation:* | Vice Chairman of the Board of Directors since August 2000 |
| *Recent Business Experience:* | Chairman of the Board of the Company (October 1982 to August 2000); Acting Vice President, Operations of the Company (August 1997 to October 1997); Chief Executive Officer of the Company (April 1983 to April 1987). Co-founder of National Semiconductor Corporation (1967). |

8

Table of Contents

## MURRAY A. GOLDMAN, PH. D.

| | |
|---|---|
| *Age:* | 67 |
| *Director Since:* | 2005 |
| *Principal Occupation:* | Chairman of the Board, Transmeta Corporation since November 1998 |
| *Recent Business Experience:* | Chief Executive Officer of Transmeta (October 2001 to April 2002), business advisor to Transmeta (March 1997 to November 1998), various executive positions with Motorola (from July 1969 to January 1997). His most recent position at Motorola was Executive Vice President, Office of the President, Semiconductor Products Sector. |
| *Other Directorships:* | Pericom Semiconductor Corporation, Three Five Systems, Inc. and Transmeta Corporation |
| *Committee Memberships:* | Member of the Compensation Committee |

## KAMBIZ Y. HOOSHMAND

| | |
|---|---|
| *Age:* | 43 |
| *Director Since:* | 2005 |
| *Principal Occupation:* | President and Chief Executive Officer of the Company since March 2005 |
| *Recent Business Experience:* | Various executive positions with Cisco Systems spanning Multi-Service Switching, DSL, Carrier Core and Multi-Service, and Optical and Broadband Transport business units (April 1996 to March 2005). His most recent position at Cisco was Vice President and General Manager of Cisco's Optical and Broadband Transport Technology group. |

## ARTHUR B. STABENOW

| | |
|---|---|
| *Age:* | 67 |
| *Director Since:* | 1988 |
| *Principal Occupation:* | Retired |
| *Recent Business Experience:* | Chairman, President and Chief Executive Officer of Micro Linear Corporation (April 1986 to January 1999). |
| *Other Directorships:* | Zoran, Inc. |
| *Committee Memberships:* | Chairman of the Compensation Committee, Member of the Audit Committee and the Governance and Nominating Committee |

9

Table of Contents

**JULIE H. SULLIVAN, PH. D.**

| | |
|---|---|
| *Age:* | 47 |
| *Director Since:* | 2005 |
| *Principal Occupation:* | Provost and Vice President for Academic Affairs at University of San Diego since July 2005 |
| *Recent Business Experience:* | Professor at the University of California, San Diego, Rady School of Management (July 2003 to July 2005), Interim Dean and Senior Associate Dean at the University of North Carolina at Chapel Hill, Kenan-Flagler Business School (July 1998 to June 2003). |
| *Committee Memberships:* | Member of the Audit Committee |

**HARVEY P. WHITE**

| | |
|---|---|
| *Age:* | 71 |
| *Director Since:* | 1999 |
| *Principal Occupation:* | Owner and Principal of (SHW)2 Enterprises, a business development and consulting firm since June 2004 |
| *Recent Business Experience:* | Chairman and Chief Executive Officer of Leap Wireless International (September 1998 to June 2004). Leap Wireless International filed a voluntary petition for reorganization under federal bankruptcy laws in April 2003. Co-Founder of Qualcomm Incorporated (1985) and President of Qualcomm (May 1992 to June 1998). |
| *Other Directorships:* | Motive, Inc. and ViaSat Inc. |
| *Committee Memberships:* | Chairman of the Audit Committee (as of the annual meeting), member of the Governance and Nominating Committee (as of the annual meeting) |

**DAVID B. WRIGHT**

| | |
|---|---|
| *Age:* | 56 |
| *Director Since:* | 2004 |
| *Principal Occupation:* | Executive Vice President, office of the CEO, Strategic Alliances and Global Accounts, for EMC $^2$ Corporation, a provider of products, services and solutions for information storage and management, since August 2004 |
| *Recent Business Experience:* | Executive Vice President and President of EMC $^2$ 's Legato Systems Division (October 2003 to August 2004). President and Chief Executive Officer, Legato Systems, Inc. (October 2000 to October 2003), various executive sales and executive management positions at Amdahl Corporation (1986 to 2000). His most recent position at Amdahl was President and Chief Executive Officer. |
| *Other Directorships:* | VA Software and Aspect Communications |
| *Committee Memberships:* | Member of the Compensation Committee |

10

Table of Contents

## PROPOSAL 2

### AMENDMENT TO 1998 EMPLOYEE STOCK PURCHASE PLAN

In 1998, the Board adopted and the stockholders approved the Company's 1998 Employee Stock Purchase Plan ("Purchase Plan"). In August 2000, the Board recommended and the stockholders approved an increase in the number of shares of common stock authorized for issuance under the Purchase Plan to a total of 11,200,000 shares.

In April 2005, the Board amended the Purchase Plan, subject to stockholder approval, to increase the number of shares of common stock authorized for issuance under the Purchase Plan to a total of 19,200,000 shares. The Board believes that the adoption of this proposal is in the best interests of the Company and its stockholders to ensure that the Company can continue to grant purchase rights at levels determined appropriate by the Board.

The Purchase Plan is intended to enable the Company to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to employees, and to promote the success of the Company's business. The Company believes that the Purchase Plan also increases stockholder value by further aligning the interests of its employees with the interests of the Company's stockholders by providing an opportunity to benefit from stock price appreciation that generally accompanies improved financial performance. The Board believes that the Company's long term success is dependent upon the ability of the Company to attract and retain superior individuals who, by virtue of their ability and qualifications, make important contributions to the Company.

During fiscal 2005, shares of common stock were purchased in the amounts and at the weighted average prices per share under the Purchase Plan as follows: Kambiz Y. Hooshmand 0 shares, David M. Rickey 7,013 shares ($2.919), Thomas L. Tullie 7,332 shares ($2.9255), Ramakrishna R. Sudireddy 0 shares, Faye Pairman 0 shares, Brian F. Wilkie 0 shares, all current executive officers as a group 40,777 shares ($2.934), and all employees (excluding executive officers) as a group 2,435,157 shares ($2.936).

As of March 31, 2005, an aggregate of 7,948,257 shares of common stock had been purchased under the Purchase Plan and 3,251,743 shares of common stock remained available for future purchase under the Purchase Plan. The Board believes that an increase to the share reserve under the Purchase Plan is necessary in order to continue operation of the Purchase Plan and avoid any potential accounting expense that would may occur in the event that (i) the share reserve would not be sufficient to cover the purchase rights of employees over a an ongoing two year offering period under the Purchase Plan and (ii) the Board approves a share increase (when such share increase has not yet been approved by the stockholders) and when such increase is intended to be used for the ongoing offering.

Stockholders are requested to approve the amendment to the Purchase Plan. The affirmative vote of the holders of a majority of the shares present in person or represented by proxy and entitled to vote at the meeting will be required to approve the amendment to the Purchase Plan. Abstentions will have the same effect as negative votes. Broker non-votes are not counted for any purpose in determining whether this proposal has been approved.

THE BOARD OF DIRECTORS
RECOMMENDS A VOTE IN FAVOR OF PROPOSAL 2.

11

Table of Contents

The essential features of the Purchase Plan are outlined below:

PURPOSE

The purpose of the Purchase Plan is to provide a means by which employees of the Company (and any subsidiary of the Company designated by the Board to participate in the Purchase Plan) may be given an opportunity to purchase shares of common stock through payroll deductions, to assist the Company in retaining the services of its employees, to secure and retain the services of new employees, and to provide incentives for such persons to exert maximum efforts for the success of the Company. All of the approximately 750 employees of the Company and its subsidiaries are eligible to participate in the Purchase Plan. Directors who are not employees are not eligible.

The rights to purchase Common Stock granted under the Purchase Plan are intended to qualify as options issued under an "employee stock purchase plan" as that term is defined in Section 423(b) of the Internal Revenue Code.

ADMINISTRATION

The Board administers the Purchase Plan and has the final power to construe and interpret both the Purchase Plan and the purchase rights granted under it. The Board has the power, subject to the provisions of the Purchase Plan, to adopt, amend and rescind any rules deemed desirable and appropriate for the administration of the Purchase Plan, including, but not limited to, the power to determine when and how rights to purchase common stock will be granted, the provisions of each offering of such purchase rights (which need not be identical), and whether employees of any subsidiary of the Company will be eligible to participate in the Purchase Plan.

The Board has the power to delegate administration of the Purchase Plan to a committee. The Board has delegated administration of the Purchase Plan to the Compensation Committee of the Board. As used herein with respect to the Purchase Plan, the "Board" refers to the Compensation Committee and to the Board.

STOCK SUBJECT TO PURCHASE PLAN

Subject to approval of this proposal, an aggregate of 19,200,000 shares of Common Stock are reserved for issuance under the Purchase Plan. If purchase rights granted under the Purchase Plan expire, lapse or otherwise terminate without being exercised, the shares of common stock not purchased under such rights again become available for issuance under the Purchase Plan.

OFFERINGS

The Purchase Plan is implemented by offerings of purchase rights to all eligible employees from time to time by the Board. Currently, the Purchase Plan, provides that each offering shall be 24 months long and is divided into four shorter "purchase periods" each approximately six months long. If the fair market value of the shares on the last day of any purchase period (a "Purchase Date") during an offering (other than the last Purchase Date of such offering) is less than the fair market value of the shares on the first business day of such offering (an "Offering Date"), then every participant in that offering is (i) automatically withdrawn from the offering at the close of such Purchase Date and after acquisition of shares for such purchase period and (ii) automatically enrolled in a new offering commencing on the first business day subsequent to such purchase period.

ELIGIBILITY

Any person who is customarily employed at least 20 hours per week and more than five months per calendar year by the Company (or by any subsidiary of the Company designated by the Board) on the first day of an offering is eligible to participate in that offering. Officers of the Company who are "highly compensated" as defined in the Internal Revenue Code are eligible to participate in the Purchase Plan.

12

Table of Contents

However, no employee is eligible to participate in the Purchase Plan if, immediately after the grant of purchase rights, the employee would own, directly or indirectly, stock possessing 5% or more of the total combined voting power or value of all classes of stock of the Company or of any parent or subsidiary of the Company (including any stock which such employee may purchase under all outstanding rights and options). In addition, no employee's right to purchase stock may accrue at a rate that exceeds $25,000 worth of common stock (determined at the fair market value of the shares at the time such purchase rights are granted) under all employee stock purchase plans of the Company and its parent and subsidiary corporations in any calendar year. In addition to the preceding limitation, under the current offering no employee may purchase more than 4,000 shares of common stock on any purchase date.

### PARTICIPATION IN THE PURCHASE PLAN

Eligible employees enroll in the Purchase Plan by delivering to the Company, prior to the date selected by the Board as the offering date for the offering, a subscription agreement authorizing payroll deductions of up to 20% of such employees' compensation (as defined in the Purchase Plan) during the purchase period.

### PURCHASE PRICE

The purchase price per share at which shares of common stock are purchased pursuant to an offering under the Purchase Plan is the lower of (i) 85% of the fair market value of a share of common stock on the Offering Date or (ii) 85% of the fair market value of a share of common stock on the Purchase Date; provided, however, that in the event (A) the Company's stockholders approve an increase in the shares available for issuance under the Purchase Plan and (B) all or a portion of such additional shares are to be issued with respect to one or more offerings that are underway at the time of such stockholder approval ("Additional Shares"), and (C) the fair market value of the common stock on the date of such approval (the "Approval Date Fair Market Value") is higher than the fair market value on the Offering Date for any such offering, then in such instance the purchase price with respect to the Additional Shares shall be 85% of the Approval Date Fair Market Value or the fair market value of the common stock on the Purchase Date, whichever is lower.

### PAYMENT OF PURCHASE PRICE; PAYROLL DEDUCTIONS

The funds used to purchase shares of common stock on each Purchase Date are accumulated through payroll deductions during the course of each purchase period of an offering. A participant may discontinue his or her payroll deductions and withdraw from an offering by giving written notice to the Company or his or her intent to withdraw at least five business days prior to each Purchase Date (withdrawal is discussed more fully below). A participant may increase or decrease payroll deductions on only one occasion during any purchase period. All payroll deductions made for a participant are credited to his or her account under the Purchase Plan and deposited with the general funds of the Company. A participant may not make additional payments into such account.

### PURCHASE OF STOCK

An eligible employee may elect to participate in the Purchase Plan by executing a subscription agreement and delivering it to the Company prior to the Offering Date. In connection with offerings made under the Purchase Plan, the Board specifies a maximum number of shares of common stock an employee may be granted the right to purchase and the maximum aggregate number of shares of common stock that may be purchased pursuant to such offering by all participants. If the aggregate number of shares to be purchased upon exercise of purchase rights granted in the offering would exceed the maximum aggregate number of shares of common stock available, the Board would make a pro rata allocation of available shares in a uniform and equitable manner. Unless the employee's participation is discontinued, his or her right to purchase shares is exercised automatically at the end of the purchase period at the applicable price. See "Withdrawal" below.

### WITHDRAWAL

A participant may withdraw from a given offering by delivering to the Company a written notice of withdrawal from the Purchase Plan in the form provided by the Company. Such withdrawal may be elected at any time up to five business days prior to each Purchase Date.

13

Table of Contents

Upon any withdrawal from an offering by the participant, the Company will distribute to the participant his or her accumulated payroll deductions without interest, less any accumulated deductions previously applied to the purchase of shares of common stock on the participant's behalf during such offering, and such participant's interest in the offering will be automatically terminated. The former participant is not entitled to again participate in that offering. However, a participant's withdrawal from an offering will not have any effect upon such participant's eligibility to participate in subsequent offerings under the Purchase Plan.

### TERMINATION OF EMPLOYMENT

If a participant terminates employment or otherwise becomes ineligible to participate in the Purchase Plan for any reason, including retirement or death, such employee's payroll contributions credited to his or her account will be returned to him or her or, in the case of his or her death, to the person or persons entitled thereto under the Purchase Plan, and his or her purchase rights will be automatically terminated.

### RESTRICTIONS ON TRANSFER

Neither contributions credited to a participant's account nor any rights under the Purchase Plan may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will, the laws of descent and distribution or pursuant to a written designation of beneficiary effective upon the death of the participant).

### ADJUSTMENT PROVISIONS

In the event of any change in shares of common stock subject to the Purchase Plan resulting from a transaction not involving receipt of consideration by the Company (such as a stock split, reverse stock split, stock dividend, combination or reclassification of the common stock), the number of shares of common stock which are available for issuance under the Purchase Plan and the number of shares of common stock covered by each purchase right under the Purchase Plan, as well as the price per share of common stock covered by each such purchase right under the Purchase Plan which has not been exercised shall be proportionally adjusted to reflect such change in accordance with the provisions of the Purchase Plan.

### EFFECT OF CERTAIN CORPORATE TRANSACTIONS

In the event of the proposed dissolution or liquidation of the Company, the offering then in progress will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board.

In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, each option under the Purchase Plan shall be assumed or an equivalent option shall be substituted by such successor corporation or a parent or subsidiary of such successor corporation, unless the Board determines, in the exercise of its sole discretion and in lieu of such assumption or substitution, to shorten the offering then in progress by setting a new Purchase Date (the "New Purchase Date"). If the Board shortens the offering then in progress in lieu of assumption or substitution in the event of a merger or sale of assets, each participant's option will be exercised automatically on the New Purchase Date, unless prior to such date he or she has withdrawn from the offering.

### DURATION, AMENDMENT AND TERMINATION

The Board may terminate or amend the Purchase Plan at any time and for any reason. Unless terminated earlier, the Purchase Plan will terminate on May 19, 2018.

Except as provided in certain corporate transactions as described above, no such termination may affect options previously granted, provided that an offering may be terminated by the Board on a Purchase Date if the Board determines that the termination of the Purchase Plan is in the best interests of the Company and the

14

**Table of Contents**

stockholders or if continuation of an offering would cause the Company to incur adverse accounting charges resulting from a change in the generally accepted accounting rules applicable to such plans. Except as provided in certain corporate transactions as described above, no amendment may make any change in any option theretofore granted which adversely affects the purchase rights of any participant. Any amendment of the Purchase Plan must be approved by the stockholders within 12 months of its adoption by the Board if (i) the amendment is necessary for the Purchase Plan to satisfy Sections 423 of the Internal Revenue Code or other applicable laws and regulations or (ii) to the extent such approval is required in order to comply with the requirements of Rule 16b-3 under the 1934 Act.

Without stockholder consent and without regard to whether any participant rights may be considered to have been adversely affected, the Board shall be entitled to change the offering and purchase periods, limit the frequency or number of changes in the amount withheld during an offering, establish the exchange ratio applicable to amounts withheld in a currency other than U.S. dollars, permit payroll withholding in excess of the amount designated by a participant in order to adjust for delays or mistakes in the Company's processing of properly completed withholding elections, establish reasonable waiting and adjustment periods or accounting and crediting procedures to ensure that amounts applied toward the purchase of common stock for each participant properly correspond with amounts withheld from the participant's compensation, and establish such other limitations or procedures as the Board determines in its sole discretion advisable which are consistent with the Purchase Plan.

FEDERAL INCOME TAX INFORMATION

Rights granted under the Purchase Plan are intended to qualify for favorable federal income tax treatment associated with rights granted under an employee stock purchase plan which qualifies under provisions of Section 423 of the Internal Revenue Code.

A participant will be taxed on amounts withheld for the purchase of shares of common stock as if such amounts were actually received. Other than this, no income will be taxable to a participant until disposition of the acquired shares, and the method of taxation will depend upon the holding period of the acquired shares.

If the stock is disposed of more than two years after the beginning of the offering period and more than one year after the stock is transferred to the participant, then the lesser of (i) the excess of the fair market value of the stock at the time of such disposition over the exercise price or (ii) the excess of the fair market value of the stock as of the beginning of the offering over the exercise price (determined as of the beginning of the offering) will be treated as ordinary income. Any further gain or any loss will be taxed as a long-term capital gain or loss. At present, such capital gains generally are subject to lower tax rates than ordinary income.

If the stock is sold or disposed of before the expiration of either of the holding periods described above, then the excess of the fair market value of the stock on the exercise date over the exercise price will be treated as ordinary income at the time of such disposition. The balance of any gain will be treated as capital gain. Even if the stock is later disposed of for less than its fair market value on the exercise date, the same amount of ordinary income is attributed to the participant, and a capital loss is recognized equal to the difference between the sales price and the fair market value of the stock on such exercise date. Any capital gain or loss will be short-term or long-term, depending on how long the stock has been held.

There are no federal income tax consequences to the Company by reason of the grant or exercise of purchase rights under the Purchase Plan. The Company is entitled to a deduction to the extent amounts are taxed as ordinary income to a participant (subject to the requirement of reasonableness and the satisfaction of tax reporting obligations).

15