Table of Contents

## EQUITY COMPENSATION PLAN INFORMATION

The following table provides certain information regarding the Company's equity compensation plans in effect as of March 31, 2005:

| Plan Category | Number of shares to be issued upon exercise of outstanding options (a) | Weighted-average exercise price of outstanding options (b) | Number of shares remaining available for future issuance under equity compensation plans (excluding securities in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by stockholders (1) | 27,704,813 | $    6.60 | 19,841,217 |
| Equity compensation plans not approved by stockholders(2) | 33,973,122 | 6.55 | 31,694,200 |
| Total(3) | 61,677,935 | 6.58 | 51,535,417 |

(1)  Includes 5,727,677 shares available for future issuance under the Purchase Plan.
(2)  Issued under the Company's 2000 Equity Incentive Plan and the 1998 Stock Incentive Plan (assumed in acquisition of Cimaron Communications Corporation) and the 1997 and 1999 Stock Option Plans (assumed in acquisition of JNI Corporation). See the plan descriptions following.
(3)  Excludes options assumed through acquisitions in which the Company did not assume the related equity plan; at March 31, 2005, such options to purchase 5,035,122 shares were outstanding with a weighted-average exercise price of $6.64 per share.

### Equity Compensation Plans Not Approved by Stockholders

In March 2000, the Company adopted the 2000 Equity Incentive Plan. The Company has reserved a total of 62,000,000 shares for the grant of nonstatutory stock options to employees, directors and consultants and affiliates under this plan. At March 31, 2005, 33,922,064 shares were outstanding and 26,084,888 shares were available for future grant under the 2000 Equity Incentive Plan.

In connection with the acquisition of Cimaron Communications Corporation in March 1999, the Company assumed options and other stock awards granted under Cimaron's 1998 Stock Incentive Plan covering 7,470,456 shares of common stock. The terms of the plan provide for the grant of nonstatutory stock options, restricted stock, or other stock based awards to employees, officers, directors, consultants, and advisors. At March 31, 2005, 21,153 shares were outstanding and 3,355,535 shares were available for future grant under the 1998 Stock Incentive Plan.

In connection with the acquisition of JNI Corporation in October 2003, the Company assumed options granted under JNI's 1997 and 1999 Stock Option Plans covering 2,318,297 million shares of common stock and the 1,778,606 shares remaining available for future grant under these plans were added to the share reserve under the Company's 1992 Stock Option Plan, a stockholder approved plan. At March 31, 2005, 29,905 shares were outstanding under the JNI plans and 2,253,777 shares were available for future grant under the Company's 1992 Stock Option Plan from the assumed JNI plans.

The Board of Directors or a committee thereof determines eligibility, vesting schedules and exercise prices for options granted under the plans. Options and other stock awards under the plans and other options granted or assumed without obtaining approval of the Company's security holders expire not more than ten years from the date of grant and are either exercisable immediately after the date of grant and subject to certain repurchase rights by the Company until such ownership rights have vested, or exercisable upon vesting. Vesting generally occurs over four years. Options are granted at prices at least equal to fair value of our common stock on the date of grant. None of these plans was required to be approved by the Company's stockholders at the time the plan was implemented and were therefore never submitted to stockholders for approval.

16

Table of Contents

# CORPORATE GOVERNANCE

AMCC has long upheld a set of basic beliefs to guide its actions, including the belief that business should be conducted with the highest standards of ethical behavior. This belief governs our interaction with our customers, suppliers, employees and investors.

The Company is committed to continuously improve its governance process to meet and exceed all regulatory requirements. The following corporate governance profile highlights some of the initiatives undertaken by the Board of Directors:

## *Independent Directors*

- At least two-thirds of the Board members must meet the Company's and Nasdaq's independence standards. All of the directors are independent under these standards except for Kambiz Y. Hooshmand and Roger A. Smullen who are employed by the Company.
- The independent directors regularly meet in executive session to discuss matters of interest to them without management present.

## *Independent Chairman of the Board*

- The Chairman of the Board is an independent director. The Chairman coordinates, develops the agenda for, and moderates Board meetings, and acts as a liaison between the independent directors and management on sensitive issues, coordinates the independent directors' annual evaluation of the performance of the Chief Executive Officer and provides the evaluation to the Compensation Committee in connection with its annual evaluation of the officer's performance, provides recommendations as to the membership of the various Board Committees, as well as selection of the Committee Chairs; and retains such counsel or consultants as the Chairman of the Board deems necessary to perform his or her responsibilities.

## *Governance and Nominating Committee*

- The Governance and Nominating Committee has adopted a charter that can be found in the Investor Relations section of the Company's corporate Web site, *http://www.amcc.com* , under Corporate Governance.
- In accordance with its charter, the Governance and Nominating Committee establishes effective corporate governance processes, including oversight of the appointment of new directors, Board committee structure and membership, Board compensation and Chief Executive Officer succession planning.
- Every Governance and Nominating Committee member is an independent director under Nasdaq listing standards.

## *Compensation Committee*

- The charter of the Compensation Committee can be found in the Investor Relations section of the Company's corporate Web site, *http://www.amcc.com* , under Corporate Governance.
- In accordance with its charter, the Compensation Committee reviews and approves all executive compensation matters.
- Every Compensation Committee member is an independent director under Nasdaq listing standards.

17

Table of Contents

*Audit Committee*

- The Audit Committee has established policies that comply with the corporate reform laws for auditor independence.

- The Audit Committee charter is attached as Appendix A to this proxy statement and can also be found in the Investor Relations section of the Company's corporate Web site, http://www.amcc.com, under Corporate Governance.

- The Board of Directors has determined that each of the current members of the Audit Committee qualifies as an "audit committee financial expert" in accordance with applicable SEC rules and that each is independent under Nasdaq listing standards.

- The Audit Committee has adopted a policy and procedures for the pre-approval of all audit and non-audit services to be rendered by the Company's independent auditors, Ernst & Young LLP. Under the policy, the Audit Committee generally pre-approves specified services in defined categories up to specified amounts. Pre-approval may also be given as part of the Audit Committee's approval of the scope of the engagement of the independent auditors or on a case-by-case basis for specific tasks before engagement. The Audit Committee has delegated the pre-approval of services to the Chairman who is required to report each pre-approval to the full Audit Committee no later than its next meeting.

- Ernst & Young LLP, the Company's independent auditors, report directly to the Audit Committee, which meets at least quarterly with the auditors without management present.

*Corporate Governance Guidelines*

- The Board has adopted a set of Guidelines that cover a broad range of corporate governance issues including director qualification and responsibility. The Guidelines can be found in the Investor Relations section of the Company's corporate Web site, *http://www.amcc.com* , under Corporate Governance.

*Code of Business Conduct and Ethics*

- The Board has also adopted a Code of Business Conduct and Ethics for the Company that all directors, executive officers and employees must review and abide by.

- The Code of Business Conduct and Ethics includes policies on regulatory compliance, conflicts of interest and confidentiality.

- The Code of Business Conduct and Ethics can be found in the Investor Relations section of the Company's corporate Web site, *http://www.amcc.com* , under Corporate Governance.

## STOCKHOLDER COMMUNICATIONS WITH THE BOARD OF DIRECTORS

Security holders wishing to communicate with the Board of Directors may send a written communication addressed to the Secretary at AMCC's principal executive offices. Communications also may be sent by e-mail to the following address: board@amcc.com. The Secretary will promptly forward the communication to the Board. This policy is contained in the Guidelines that can be found in the Investor Relations section of the Company's corporate Web site, *http://www.amcc.com* , under Corporate Governance.

In addition, the Company has a formal policy regarding attendance by members of the Board of Directors at the Company's Annual Meeting of Shareholders. Board members are invited and are expected to attend the annual meetings of the Company's stockholders. This policy is contained in the Guidelines that can be found in the Investor Relations section of the Company's corporate Web site, *http://www.amcc.com* , under Corporate Governance. All of the directors who were members of the Board at the time attended the 2004 annual meeting.

Table of Contents

## GOVERNANCE AND NOMINATING COMMITTEE EVALUATION OF BOARD NOMINEES

The Company's Bylaws contain provisions which address the process by which a stockholder may nominate an individual to stand for election to the Board of Directors at the Company's Annual Meeting of Stockholders. The Governance and Nominating Committee will consider director candidates recommended by AMCC stockholders. Stockholders who wish to recommend individuals for consideration by the Governance and Nominating Committee to become nominees for election to the Board at an annual meeting of stockholders may do so by delivering at least 120 days prior to the anniversary date of the mailing of the Company's proxy statement for its last annual meeting of stockholders a written recommendation to the Governance and Nominating Committee c/o the Secretary at AMCC's principal executive offices. Each submission must set forth:

- the name and address of each AMCC stockholder on whose behalf the submission is made;

- the number of AMCC shares that are owned beneficially by such stockholder;

- the full name of the proposed candidate;

- a description of the proposed candidate's business experience for at least the previous five years;

- complete biographical information for the proposed candidate; and

- a description of the proposed candidate's qualifications as a director.

Each submission must be accompanied by the written consent of the proposed candidate to be named as a nominee and to serve as a director if elected.

To date, the Company has not received any recommendations from stockholders requesting that the Governance and Nominating Committee consider a candidate for inclusion among the Committee's slate of nominees in the Company's proxy statement.

The Governance and Nominating Committee believes that candidates for director should have certain minimum qualifications, including the highest personal and professional integrity and values, an inquiring and independent mind, practical wisdom and mature judgment. In evaluating director nominees, the Governance and Nominating Committee considers the following factors:

- recognized achievement and reputation;

- an ability to contribute to some aspect of AMCC's activities, and;

- the willingness to make the commitment of time and effort required of an AMCC director.

The Governance and Nominating Committee's goal is to assemble a Board of Directors with the skills and characteristics that taken together will assure a strong Board with experience and expertise in corporate governance.

The Governance and Nominating Committee is responsible for reviewing periodically with the Board, including the Chief Executive Officer, the appropriate skills and characteristics required of new Board members in the context of the current makeup of the Board.

Other than the foregoing there are no stated minimum criteria for director nominees, although the Governance and Nominating Committee may also consider such other factors as it may deem are in the best interests of the Company and its stockholders. The Governance and Nominating Committee does, however, believe it appropriate for at least one, and, preferably, several, members of the Board to meet the criteria for an "audit committee financial expert" as defined by SEC rules, and that two thirds of the members of the Board meet independent director standards. The Governance and Nominating Committee also believes it is appropriate for certain key members of the Company's management to participate as members of the Board.

Table of Contents

The Governance and Nominating Committee identifies nominees by first evaluating the current members of the Board of Directors willing to continue in service. Current members of the Board with skills and experience that are relevant to the Company's business and who are willing to continue in service are considered for re-nomination, balancing the value of continuity of service by existing members of the Board with that of obtaining a new perspective. If any member of the Board does not wish to continue in the service of if the Governance and Nominating Committee decides not to re-nominate a member for re-election, the Governance and Nominating Committee identifies the desired skills and experience of a new nominee in light of the criteria above. The Governance and Nominating Committee then uses its network of contacts to compile a list of candidates, but may also engage, if it deems appropriate, a professional search firm.

## BOARD MEETINGS AND ATTENDANCE

**Board Meetings in Fiscal 2005:**  24

**Board Committees:**  Three standing committees: Audit, Compensation, Governance and Nominating

**Total Committee Meetings in Fiscal 2005:**  33

**Fiscal 2005 Attendance:**  Each current Board member attended 75% or more of the meetings of the Board and the committees on which he served, held during the period for which he was a director or committee member.

20

Table of Contents

## BOARD COMMITTEES

| Name of Committee and Members | Principal Functions of the Committee | Meetings in fiscal 2005 |
|---|---|---|
| *Audit*<br>Franklin P. Johnson, Jr., Chairman<br>Arthur B. Stabenow<br>Julie H. Sullivan (since February 2005)<br>Harvey P. White (Chairman as of the annual meeting) | • Has direct responsibility for the appointment, evaluation, compensation, retention and oversight of the work of the Company's outside auditors. The Company's outside auditors report directly to the Committee, and the Committee's responsibilities include: the resolution of disagreements between management and the outside auditors regarding financial reporting and the pre-approval of all audit and non-audit services provided by the Company's outside auditors.<br><br>• Receives periodic reports from the auditors and management regarding the auditors' independence and other matters. Recommends appropriate action to ensure the auditors' independence.<br><br>• Reviews with management and the independent auditors the Company's quarterly and annual financial statements and other financial disclosures, the adequacy of internal controls and major issues regarding accounting principles and practices.<br><br>• Reviews and approves the scope of the audit at the outset and reviews the performance of the independent auditors and any audit problems or difficulties encountered. | 13 |
| *Compensation*<br>Arthur B. Stabenow, Chairman<br>Cesar Cesaratto<br>L. Wayne Price<br>David B. Wright (since November 2004)<br>Murray A. Goldman (since June 2005) | • Approves remuneration arrangements for all of the Company's executive officers, including base salaries, salary increases, incentive compensation plans and awards. Reviews the reasonableness and appropriateness of all such compensation.<br><br>• Adopts and oversees the administration of incentive compensation and executive stock plans and determines awards granted to executive officers and employees under such plans.<br><br>• Advises the Board on the reasonableness and appropriateness of executive compensation plans and levels, generally, including whether these effectively serve the interests of the Company and its stockholders by creating appropriate incentives for high levels of individual and Company performance.<br><br>• Has authority to engage an executive compensation consultant and other advisors. | 13 |

21

**Table of Contents**

| Name of Committee and Members | Principal Functions of the Committee | Meetings in fiscal 2005 |
|---|---|---|
| *Governance & Nominating*<br>Cesar Cesaratto, Chairman<br>Franklin P. Johnson, Jr.<br>Arthur B. Stabenow<br>Harvey P. White (as of the annual meeting) | • Makes recommendations to the Board regarding the composition of the Board and its Committees, including size and qualifications for membership.<br>• Recommends candidates for election to the Board at the annual meeting.<br>• Advises the Board on appropriate compensation for outside directors.<br>• Advises the Board on corporate governance matters.<br>• Has sole authority to engage a search firm to identify director candidates.<br>• Evaluates the performance of the members of the Board of Directors.<br>• Evaluates the effectiveness of the meetings of the Board, including agendas, meeting materials, meeting structure and organization, schedule of meetings and minutes. | 7 |

22

Table of Contents

## REPORT OF THE COMPENSATION COMMITTEE*

The Compensation Committee of the Board has responsibility for administering and approving all elements of compensation for executive officers of the Company. It also grants options to executive officers under the Company's equity incentive plans and it administers the Company's employee stock option and employee stock purchase plans. The Committee has direct responsibility to review and approve the corporate goals and objectives relevant to the Chief Executive Officer's compensation, evaluates the CEO's performance in light of these goals and objectives, and determines and approves the CEO's compensation level based on the evaluation. The Committee's charter reflects these various responsibilities, and the Committee and the Board periodically review and revise the charter.

The Board determines the Committee's membership. All members of the committee are independent in accordance with Nasdaq listing standards. The Committee meets at scheduled times during the year, and it may also meet telephonically if a need arises, and it may consider and take action by written consent. The Committee Chairman reports on Committee actions and recommendations at Board meetings. Executive officers who are also directors are not present during voting or deliberations involving their own compensation.

### General Compensation Philosophy

Under the supervision of the Compensation Committee, the Company's compensation policy is designed to attract, motivate and retain qualified key executives. It is the objective of the Company to reward its executives for advancing business strategies and aligning Company interests with those of the shareholders. Each executive's compensation is dependent upon the Company's performance as well as upon the executive's individual performance. Accordingly, executive officer compensation packages are comprised of three elements: (i) base salary, (ii) variable bonus payable in cash if earned, and (iii) equity awards All elements of executive compensation are reviewed at least annually to ensure they are comparable with similarly situated executives at peer companies and meet the current strategies and needs of the Company.

The principal factors that were taken into account by the Compensation Committee to establish each of the three primary components of the compensation package provided to the executive officers are described below.

### Base Salary

In setting executive officer base salaries, the Compensation Committee considers a number of factors, including benchmark data from nationally recognized surveys of similar high-technology companies that compete with the Company for executive officers. The Compensation Committee reviews proxy data on executive compensation for peer companies that include semiconductor and computer component companies operating in similar markets. In addition, the Compensation Committee evaluates corporate performance relative to competitors and the success of the Company in meeting its financial objectives when determining executive base salaries. Annually, each executive officer's base salary is reviewed on the basis of the individual's qualifications and relevant experience, their contribution and performance for the prior year, and the compensation levels of executives at similar high-technology companies. The Compensation Committee currently uses the 62 $^1$/2 percentile of the surveyed group for comparison purposes when setting salaries. Base salary is generally reviewed once each year, but is not necessarily adjusted every year.

### Variable Bonus

The executive variable bonus plan is based on the achievement of certain financial performance measures of the Company, including revenue- and operating income-based measures. A pre-determined formula, which takes

---

\*    This Section is not "soliciting material," is not deemed "filed" with the SEC and is not to be incorporated by reference in any filing of the Company under the Securities Act of 1933 (the "1933 Act") or the 1934 Act whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

23

Table of Contents

into account operating profitability against the annual plan approved by the Board, is used to determine the bonus pool. The individual executive officer's share of the bonus pool is based upon an individual bonus target for each executive position that was established as a result of survey and proxy benchmarking data from peer companies. The Compensation Committee currently uses the 62 $^1/2$ percentile of the surveyed group for comparison purposes when setting bonus targets. The Compensation Committee also takes into consideration each officer's performance during the prior fiscal year when determining variable bonus awards. No executives have been awarded a variable bonus since fiscal 2001.

## Equity Awards

The goal of the Company's long-term, equity awards is to align the interests of executive officers and employees with stockholders of the Company. Equity awards are intended to focus the attention of the executive officer on the Company's long-term performance and to motivate them to maximize stockholder value.

The Compensation Committee determines the appropriate equity award to executive officers based on the individual's position and responsibilities with the Company, his or her performance and contribution since the last equity award, and market grant practices among peer high-technology companies. Each option grant allows the executive officer to acquire shares of common stock at a fixed price per share. In fiscal year 2005, 20% of the total annual stock option grant to each executive officer was awarded at a premium price of 110% of the fair market value of the Company's common stock at the time of grant. The options typically vest in periodic installments over a four-year period contingent upon the executive officer's continued employment with the Company. Accordingly, the options will provide a return to the executive officer only if he or she remains in the Company's service so the options can vest, and then only if the market price of the common stock appreciates over the option's premium price during the option term. Beginning in fiscal 2006, at least 33% of the annual stock awards granted to each executive officer will have exercise prices set at 110% premium of the fair market value of the common stock at the date of grant or have other performance-based characteristics. The Compensation Committee will continue to monitor the equity program carefully and seek to introduce additional compensation practices to promote long-term performance-based focus in its executive officers.

## Compensation for David M. Rickey

David M. Rickey served as the Company's Chief Executive Officer from February 1996 to March 2005. In March 2005, Mr. Rickey and the Company entered into an employment transition and retirement agreement. Under the terms of the employment transition and retirement agreement, Mr. Rickey agreed to resign as Chairman, President and Chief Executive Officer and as a member of the AMCC Board of Directors effective as of March 20, 2005 and to assist the Company with the transition to a new Chief Executive Officer until August 25, 2005.

Under the terms of the employment transition and retirement agreement, Mr. Rickey continues to receive his base salary of $425,000 and to vest in his previously granted stock options until August 25, 2005. Mr. Rickey also continues to receive his standard Company benefits until August 25, 2005, at which time, he can participate in the Company's Post-Termination Medical Insurance Program. Mr. Rickey can continue to participate in this medical insurance program until the earlier of the date that he receives a comparable medical insurance program from another employer, or Mr. Rickey's 65 [th] birthday. AMCC will reimburse Mr. Rickey for the cost of his participation in the medical insurance program until the earlier of the date he no longer is eligible for the program, or 18 months from August 25, 2005.

## Compensation for Kambiz Y. Hooshmand

In March 2005, Kambiz Y. Hooshmand was named the Company's President and Chief Executive Officer effective March 21, 2005. Mr. Hooshmand was also elected to the Company's Board of Directors. The material terms of Mr. Hooshmand's compensation package are as follows:

*Base Salary*:  Mr. Hooshmand will receive an annual base salary of $400,000 and will serve on the Company's Board of Directors without any additional compensation.

24

Table of Contents

*Cash Incentive* :   For fiscal year 2006 Mr. Hooshmand will receive a $300,000 gross bonus payable at the close of the fiscal year. In subsequent fiscal years, Mr. Hooshmand will be eligible for a bonus of up to 75% of his base salary dependent on the achievement of corporate and personal objectives to be set annually by the Compensation Committee.

*Long Term Incentive* :   On March 21, 2005 Mr. Hooshmand received an option to purchase 2,200,000 shares of the Company's common stock with an exercise price of $3.21 and an option to purchase 550,000 shares with an exercise price of $3.53 for his role as Chief Executive Officer and President. These options vest as to 25% of the grant upon his completion of one year of service and the remaining 75% of the grant vest 1/48 th each month thereafter. Mr. Hooshmand does not receive any additional stock option awards for his participation on the Company's Board of Directors. On June 2, 2005, Mr. Hooshmand received a performance-based option to purchase 250,000 shares of the Company's common stock with an exercise price of $2.98. These options become 100% vested and exercisable only upon the achievement of certain revenue and operating income objectives agreed upon with the Compensation Committee.

*Severance Benefits:*    If the Company terminates Mr. Hooshmand without cause or Mr. Hooshmand voluntarily resigns his employment for good reason, the Company will pay him a separation payment equal to 18 months base salary and a pro-rated portion of a $300,000 bonus. He will also be provided with certain medical and dental benefits for one year after his termination date. In addition, Mr. Hooshmand's unvested stock options other than the performance-based option to purchase 250,000 shares will immediately vest as if he had completed an additional 24 months of service with the Company and the options will be exercisable for 24 months after the date of termination (but not beyond the expiration of the options' respective maximum terms).

**Tax Deductibility**

The Compensation Committee has considered the impact of Section 162(m) of the Internal Revenue Code, which disallows a deduction for any publicly held corporation for individual compensation exceeding $1 million in any taxable year for the Chief Executive Officer and four most highly compensated executive officers unless such compensation meets the requirements for the "performance based compensation." As the cash compensation paid by the Company to each of its executives is expected to be below $1 million and the Compensation Committee believes that options granted under the Company's 1992 Stock Option Plan to such officers will meet the requirements for qualifying as performance based compensation, the Compensation Committee believes that Section 162(m) will not affect the tax deductions available to the Company with respect to the compensation of its executives. It is the Compensation Committee's policy to qualify to the extent reasonable its executive officer compensation for deductibility under applicable tax law. However, the Company may, from time to time, pay compensation to its officers that may not be deductible.

Arthur B. Stabenow, Chairman
Cesar Cesaratto
Murray A. Goldman (since June 2005)
L. Wayne Price
David B. Wright (since November 2004)

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

As noted above, the Company's Compensation Committee consists of Messrs. Stabenow, Cesaratto, Goldman, Price and Wright. None of these directors has at any time been an officer of the Company or any subsidiary of the Company. During the last fiscal year, no interlocking relationship existed between the Company's Board of Directors or Compensation Committee and the board of directors or compensation committee of any other company.

Table of Contents

# REPORT OF THE AUDIT COMMITTEE*

The Audit Committee is comprised solely of independent directors, in accordance with Nasdaq listing standards and it operates under a written charter adopted by the Board. The Audit Committee reviews and assesses the adequacy of its charter on an annual basis.

The Audit Committee oversees the Company's financial reporting process on behalf of the Board. The purpose of the Audit Committee, as more fully described in its charter, is the general oversight of the Company's financial reporting, internal control and audit functions. Management is responsible for the preparation, presentation and integrity of the Company's financial statements, accounting principles, and design of internal controls and disclosure controls and procedures to ensure compliance with accounting standards, applicable laws and regulations. Ernst & Young LLP, the Company's independent Registered Public Accounting firm, is responsible for performing an independent audit of the consolidated financial statements in accordance with generally accepted auditing standards.

Among other matters, the Audit Committee monitors the activities and performance of the Company's independent auditor, including the audit scope, external audit fees, auditor independence matters and the extent to which the independent auditor may be retained to perform non-audit services. The Audit Committee has ultimate authority and responsibility to select, evaluate and, when appropriate, replace the Company's independent auditors. The Audit Committee also reviews the results of the audit work with regard to the adequacy and appropriateness of the Company's financial, accounting and internal controls.

In fulfilling its oversight responsibilities, the Audit Committee has reviewed and discussed the audited consolidated financial statements in the Annual Report with management including a discussion of the quality, not just acceptability, of the accounting principles, reasonableness of significant judgments, and clarity of disclosures in the financial statements.

The Audit Committee reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with U.S. generally accepted accounting principles, its judgments as to the quality, not just acceptability, of the accounting principles, reasonableness of significant judgments, and clarity of disclosures in the financial statements. In addition, the independent auditor represented that, its presentations included the matters required to be discussed with the Audit Committee by Statement on Auditing Standards No. 61, as amended, "Communication with Audit Committees."

The Company's independent auditor also provided the Audit Committee with the written disclosures required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," and the Audit Committee discussed with the independent auditor that firm's independence.

In reliance on the Audit Committee's reviews and discussions with management and the independent auditor, the Audit Committee recommended that the Board include the audited consolidated financial statements in the Company's annual report on Form 10-K for the year ended March 31, 2005.

Franklin P. Johnson, Jr., Chairman
Arthur B. Stabenow
Julie H. Sullivan (since February 2005)
Harvey P. White

---

*    This Section is not "soliciting material," is not deemed "filed" with the SEC and is not to be incorporated by reference in any filing of the Company under the 1933 Act or the 1934 Act whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

26

Table of Contents

# PROPOSAL 3

## RATIFICATION OF SELECTION OF INDEPENDENT AUDITORS

The Audit Committee of the Board of Directors has selected Ernst & Young LLP as the Company's independent auditors for the fiscal year ending March 31, 2006 and has further directed the Company to submit the selection of independent auditors for ratification by the stockholders at the annual meeting. Ernst & Young LLP has audited the Company's financial statements since its inception in 1980. Representatives of Ernst & Young LLP are expected to be present at the annual meeting. They will have an opportunity to make a statement if they so desire and will be available to respond to appropriate questions.

Neither the Company's Bylaws nor other governing documents or law require stockholder ratification of the selection of Ernst & Young LLP as the Company's independent auditors. However, the Audit Committee is submitting the selection of Ernst & Young LLP to the stockholders for ratification as a matter of good corporate practice. If the stockholders fail to ratify the selection, the Audit Committee will reconsider whether or not to retain that firm. Even if the selection is ratified, the Audit Committee in its discretion may direct the appointment of different independent auditors at any time during the year if it determines that such a change would be in the best interests of the Company and its stockholders.

The affirmative vote of the holders of a majority of the shares present in person or represented by proxy and entitled to vote at the annual meeting will be required to ratify the selection of Ernst & Young LLP. Abstentions will have the same effect as negative votes. Broker non-votes are not counted for any purpose in determining whether this proposal has been approved.

THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
RECOMMENDS A VOTE IN FAVOR OF PROPOSAL 3.

## AUDIT AND OTHER FEES

The following tables set forth the aggregate fees billed by Ernst & Young LLP for the services indicated for the fiscal year ended March 31:

|  | 2005 | 2004 |
|---|---|---|
| Audit | $606,900 | $224,500 |
| Audit Related | 89,042 | 104,392 |
| Tax | 50,868 | 121,275 |
| All Other | — | — |
| Total | $746,810 | $450,167 |

**Audit Fees.**   Audit fees include the audit of the Company's financial statements including the audit of our internal control over financial reporting for the fiscal year and the review of the Company's interim financial statements.

**Audit Related Fees.**   Audit related fees included fees for among other things, accounting consultations, acquisition-related work and statutory required audits in certain locations outside the United States where the Company has operations.

**Tax Fees.**   Tax fees consist of tax preparation services for employees on foreign assignment, technical tax advise on U.S. and international tax matters, assistance with foreign income tax return preparation, transfer pricing analysis, assistance with local tax authority documentation and reporting requirements for tax compliance purposes, consultation regarding tax implications of acquisitions and assistance with tax audit defense matters.

**All Other Fees.**   There were no other fees billed by Ernst & Young LLP.

All fees described above were approved by the Audit Committee. The Audit Committee has determined the rendering of the tax consulting services by Ernst & Young LLP is compatible with maintaining the auditor's independence.

27

Table of Contents

# COMPENSATION OF DIRECTORS

Directors' compensation is only paid to non-employee directors.

**Board of Directors Annual Retainer:**  $12,000

**Chairman of the Board Annual Retainer:**  $24,000

**Committee Chairman Annual Retainer:**  $12,000

**Committee Member Annual Retainer:**  $8,000

**Meeting fees:**  $2,000 per Board of Directors meeting attended, $500 per telephonic Board of Directors meeting. $1,000 per Committee meeting attended, $500 per telephonic Committee meeting.

**Expenses:**  Reasonable travel-related expenses are reimbursed for attendance at Board and Committee Meetings.

**Aggregate Directors Compensation:**  In the fiscal year ended March 31, 2005, the total compensation paid to all non-employee directors as a group was $349,665.

**Stock Options:**  Each person who becomes a non-employee director of the Company is granted a stock option to purchase 75,000 shares of common stock on the date on which the optionee first becomes a non-employee director. The exercise price of each stock option granted is equal to the fair market value of one share of common stock on the date of grant. Options granted become exercisable or "vest" in 36 equal monthly installments following the date of grant.

On April 1 of each year, each non-employee director is granted an option to purchase 50,000 shares of common stock if on such date, he or she has served on the Company's Board for at least six months. The Chairman of the Board is granted an additional option to purchase 10,000 shares of common stock on April 1 of each year. The exercise price of each stock option granted is equal to the fair market value of one share of common stock on the date of grant. Options granted become exercisable or "vest" in 12 equal monthly installments following the date of grant.

In the event of a dissolution or liquidation of the Company, a sale of all or substantially all of the Company's assets, a merger or consolidation in which the Company is not the surviving corporation, or any other capital reorganization in which more than 50% of the shares of the Company entitled to vote are exchanged, the Company will give to the director either a reasonable time within which to exercise the option, including shares as to which the option would not be otherwise exercisable, prior to the effectiveness of such event after which the option will terminate, or the right to exercise the option, including shares as to which the option would not be otherwise exercisable (or a substitute option with comparable terms), as to an equivalent number of shares of stock of the corporation succeeding the Company or acquiring its business by reason of such liquidation, dissolution, sale, merger, consolidation or reorganization.

Table of Contents

## COMPENSATION OF EXECUTIVE OFFICERS

The following table shows the compensation awarded or paid to, or earned by, each individual who served as the Company's Chief Executive Officer during fiscal 2005 and its other four most highly compensated individuals who served as executive officers during fiscal year 2005 (the "Named Executive Officers"), and the compensation received by each officer in the prior two fiscal years:

### SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Annual Compensation | | Other Annual Compensation ($) | Long-Term Compensation Awards Securities Underlying Options/ SARs(#) | All Other Compensation ($)(2) |
|---|---|---|---|---|---|---|
| | | Salary ($)(1) | Bonus ($) | | | |
| Kambiz Y. Hooshmand President and Chief Executive Officer | 2005 | 13,849(3) | — | — | 2,750,000 | — |
| David M. Rickey Former Chairman of the Board, President and Chief Executive Officer(4) | 2005 | 423,063 | — | — | — | 2,000 |
| | 2004 | 350,000 | — | 54,128(5) | 560,000 | 4,851 |
| | 2003 | 391,500 | — | — | 8,000,000(6) | 5,005 |
| Thomas L. Tullie Chief Operating Officer(7) | 2005 | 392,321(8) | — | — | 415,000 | — |
| | 2004 | 294,336(9) | — | — | 130,000 | — |
| | 2003 | 267,926(10) | — | — | 750,000(11) | — |
| Ramakrishna R Sudireddy Senior Vice President, Engineering(12) | 2005 | 271,339 | — | — | 65,000 | 2,000 |
| | 2004 | 234,000 | — | — | 200,000 | 1,730 |
| | 2003 | 234,000 | — | — | 1,000,000(13) | 2,000 |
| Faye Pairman Senior Vice President and General Manager, Storage Business | 2005 | 244,604 | — | — | 75,000 | — |
| Brian F. Wilkie Vice President and General Manager, Embedded Products Group | 2005 | 157,889 | 90,000(14) | — | 235,000 | 2,000 |

(1)   Includes the officers' pre-tax contributions to the AMCC 401(k) Plan.
(2)   Includes the Company's matching contributions under the AMCC 401(k) Plan and annual premiums paid by the Company on a term life insurance policy.
(3)   Reflects salary paid from March 21, 2005. Mr. Hooshmand's annual salary is $400,000.
(4)   Mr. Rickey resigned from all positions effective March 20, 2005. He will remain a non-executive employee of the Company until August 25, 2005.
(5)   Includes Company provided transportation of $54,128.
(6)   Includes replacement options to purchase 5,200,000 shares of common stock that were granted on May 28, 2002 in exchange for the prior cancellation of existing options for the same number of shares in connection with the Company's stock option exchange program.
(7)   Mr. Tullie's employment terminated effective June 17, 2005.
(8)   Includes commissions earned by Mr. Tullie in the amount of $104,382.
(9)   Includes commissions earned by Mr. Tullie in the amount of $94,336.
(10)  Includes commissions earned by Mr. Tullie in the amount of $67,926.

29

Table of Contents

(11)   Includes replacement options to purchase 650,000 shares of common stock that were granted on May 28, 2002 in exchange for the prior cancellation of existing options for the same number of shares in connection with the Company's stock option exchange program.

(12)   Mr. Sudireddy's employment terminated effective March 31, 2005.

(13)   Includes replacement options to purchase 700,000 shares of common stock that were granted on May 28, 2002 in exchange for the prior cancellation of existing options for the same number of shares in connection with the Company's stock option exchange program.

(14)   Includes fixed bonus per employment agreement.

30

Table of Contents

## OPTION GRANTS IN LAST FISCAL YEAR

The following table shows information regarding options granted to the Named Executive Officers for fiscal 2005 and hypothetical gains on those options based on 5% or 10% annual compound stock price appreciation during the ten-year option term. All the grants were made under the Company's 1992 Stock Option Plan. No stock appreciation rights were granted to any of the Named Executive Officers during fiscal 2005.

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(1) | |
|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Options Granted (#) | % of Total Options Granted to Employees in Fiscal Year | Exercise Price ($/Sh)(2) | Expiration Date | 5% ($) | 10% ($) |
| Kambiz Y. Hooshmand | 2,200,000 | 17.1271 | 3.21 | 3/21/15 | 4,441,254 | 11,255,009 |
| | 550,000 | 4.2818 | 3.53 | 3/21/15 | 933,763 | 2,637,202 |
| David M. Rickey | — | — | — | — | — | — |
| Thomas L. Tullie | 200,000 | 1,5570 | 5.04 | 6/3/14 | 633,926 | 1,606,492 |
| | 50,000 | .3893 | 5,54 | 6/3/14 | 133,281 | 376,423 |
| | 100,000 | .7785 | 3.60 | 2/24/15 | 226,402 | 573,747 |
| | 26,000 | .2024 | 3.62 | 9/2/14 | 45,242 | 127,775 |
| | 39,000 | .3036 | 3.29 | 9/2/14 | 80,693 | 204,493 |
| Ramakrishna R. Sudireddy | 39,000 | .3036 | 3.29 | 9/2/14 | 80,693 | 204,493 |
| | 26,000 | .2024 | 3.62 | 9/2/14 | 45,242 | 127,775 |
| Faye Pairman | 10,000 | .0779 | 3.29 | 9/2/14 | 20,691 | 52,434 |
| | 15,000 | .1168 | 3.62 | 9/2/14 | 26,101 | 73,716 |
| | 50,000 | .3893 | 3.60 | 2/24/15 | 113,201 | 286,874 |
| Brian F. Wilkie | 160,000 | 1.2456 | 5.09 | 5/24/14 | 512,172 | 1,297,944 |
| | 50,000 | .3893 | 3.60 | 2/24/15 | 113,201 | 286,874 |
| | 15,000 | .1168 | 3.62 | 9/2/14 | 26,101 | 73,716 |
| | 10,000 | .0779 | 3.29 | 9/2/14 | 20,691 | 52,434 |

(1) The 5% and 10% assumed annual rates of compounded stock price appreciation are prescribed by the rules and regulations of the SEC and do not represent the Company's estimate or projection of the future trading prices of its common stock. Unless the market price of the common stock appreciates over the option term, no value will be realized from these option grants. Actual gains, if any, on stock option exercises are dependent on numerous factors, including, without limitation, the future performance of the Company, overall business and market conditions, and the optionee's continued employment with the Company throughout the entire vesting period, which factors are not reflected in this table.

(2) The exercise price may be paid in cash or in shares of common stock valued at the fair market value on the exercise date. Options may also be exercised, to the extent permissible under applicable law and Company policy, through a cashless exercise procedure pursuant to which the optionee provides irrevocable instructions to a brokerage firm to sell the purchased shares and to remit to the Company, out of the sale proceeds, an amount equal to the exercise price plus all applicable withholding taxes.

Table of Contents

## AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND
## FISCAL YEAR END OPTION VALUES

The following table shows certain information regarding options exercised during fiscal 2005 and options held at March 31, 2005 by the Named Executive Officers. The Company had no stock appreciation rights outstanding during fiscal 2005.

| Name | Options Exercised During Fiscal 2005 | | Options Held at Fiscal Year End | |
|---|---|---|---|---|
| | Shares Acquired on Exercise (#) | Value Realized ($) | Number of Securities Underlying Unexercised Options Exercisable/Unexercisable (#) | Value of Unexercised In-the-Money Options Exercisable/Unexercisable ($) |
| Kambiz Y. Hooshmand | — | — | 0/2,750,000 | 0/154,000 |
| David M. Rickey | — | — | 7,414,167/1,465,833 | 0/0 |
| Thomas L. Tullie | — | — | 1,226,370/493,230 | 60,337/0 |
| Ramakrishna R. Sudireddy | — | — | 1,681,571/0 | 0/0 |
| Faye Pairman | 274,193 | 953,816 | 122,905/561,411 | 383,868/1,535,477 |
| Brian F. Wilkie | — | — | 0/235,000 | 0/0 |

32

Table of Contents

## EMPLOYMENT, SEVERANCE AND CHANGE OF CONTROL AGREEMENTS

In December 2002, the Company entered into a three-year employment agreement with David M. Rickey. Under the terms of the employment agreement, the Company granted to Mr. Rickey options to purchase an aggregate of 3,000,000 shares of common stock at exercise prices equal to the fair market value of the common stock on the date of grant. The employment agreement provided that these options were intended to be the only options granted to Mr. Rickey by the Company during the term of the agreement. The employment agreement also set Mr. Rickey's annual salary at $350,000 subject to annual review by the Compensation Committee of the Board of Directors. In April 2004, the Compensation Committee approved an increase in Mr. Rickey's salary to $425,000 effective as of the beginning of fiscal 2005. The Company entered into an Employment Transition and Retirement Agreement (the "Transition Agreement") with Mr. Rickey on March 9, 2005 pursuant to which the employment agreement was terminated. Under the terms of the Transition Agreement, Mr. Rickey will remain an employee of the Company until August 25, 2005 and assist the Company with the transition to a new Chief Executive Officer. The Company will continue to pay Mr. Rickey's salary and provide him with benefits until August 25, 2005. After August 25, 2005, Mr. Rickey will be allowed to participate in the Company's Post-Termination Medical Insurance Program until his 65th birthday (unless he receives a comparable medical insurance benefit from another employer then). The Company will reimburse Mr. Rickey for the cost of such participation until February 25, 2007 (unless he receives a comparable medical insurance benefit from another employer before then). The Transition Agreement also contains a release of claims, including employment-related claims, by Mr. Rickey.

In March 2005, the Company entered into a letter agreement with Kambiz Y. Hooshmand, pursuant to which Mr. Hooshmand will serve as President and Chief Executive Officer of the Company. Under the agreement, Mr. Hooshmand will receive a base salary at an annual rate of $400,000. The agreement also provides that Mr. Hooshmand will be eligible to participate in any annual bonus program that the Compensation Committee may establish. His bonus will be targeted at 75% of his base salary. During the first year of his employment Mr. Hooshmand will receive a guaranteed bonus of $300,000, payable after the close of the Company's fiscal 2006. Mr. Hooshmand was granted options to purchase 2,750,000 shares of the Company's common stock. The options have a term of ten years and vest over a four-year period. Twenty percent of the 2,750,000 stock option grant was granted at a 10% premium to fair market value. The remaining 80% of the 2,750,000 options was priced at fair market value. Mr. Hooshmand was granted an additional stock option to purchase 250,000 shares in June 2005. The 250,000 option was priced at fair market value on the grant date and will vest and become exercisable only upon the achievement of revenue and operating income objectives. Mr. Hooshmand is eligible for the Company's standard medical, dental and life insurance benefits, 401K plan and the Company's deferred compensation plan. In addition, the Company will pay for a supplemental life insurance policy with a face value of $2 million for the benefit of Mr. Hooshmand's beneficiary. The agreement also provides for the reimbursement of relocation and temporary living expenses (including tax reimbursement for any taxable income realized upon such reimbursement) along with other benefits commensurate with those offered to other executive officers of the Company. Pursuant to the agreement, if the Company terminates Mr. Hooshmand's employment without cause or if Mr. Hooshmand terminates his employment for good reason, the Company will pay a separation payment equal to 18 months base salary, less applicable withholdings and deductions. The Company will also pay Mr. Hooshmand a pro rata portion of a $300,000 bonus. Also, Mr. Hooshmand's 2,750,000 stock options will immediately vest as if he had completed an additional 24 months of service with the Company and will be exercisable for an additional 24 months after the date of termination (or, if earlier, on the original expiration date of such option). If Mr. Hooshmand's employment is terminated by the Company or he resigns for good reason within 12 months following a change of control, he will also receive the foregoing severance benefits.

In March 2005, the Company entered into an Employment Agreement with Thomas L. Tullie. Under the terms of the Employment Agreement, Mr. Tullie received a base salary at an annual rate of $300,000 and his non-qualified stock options were amended to provide for their exercise for 24 months from the date of termination of employment (or, if earlier, until the original expiration date of such option). Mr. Tullie resigned

33

Table of Contents

effective as of June 17, 2005. On June 24, 2005, the Company entered into a Release of Claims Agreement with Mr. Tullie, pursuant to which he will receive a bonus of $300,000 and his stock options will immediately vest as if he had completed an additional 12 months of service with the Company. The Release of Claims Agreement also contains Mr. Tullie's release of claims, including employment-related claims.

In May 2005, the Company entered into a Separation and Release of Claims Agreement with Ramakrishna Sudireddy. Mr. Sudireddy's employment terminated on March 31, 2005. The agreement provides that the Company will pay Mr. Sudireddy $202,000, less applicable withholdings and deductions, and continue to provide him with medical benefits until June 30, 2005. The agreement also contains Mr. Sudireddy's release of claims, including employment-related claims.

In March 2004, the Company entered into an Employment and Non-Solicitation Agreement with Faye Pairman as Senior Vice President of Storage. The agreement provides that Ms. Pairman will receive an annual base salary of $252,000. Pursuant to the agreement, if the Company terminates Ms. Pairman's employment without cause or Ms. Pairman resigns with good reason, the Company will pay her a lump sum severance payment equal to 12 months base salary, reimburse her medical insurance premiums for 12 months after the termination of employment and give her 24 months vesting credit on the stock options previously granted by 3Ware and assumed by the Company when it acquired 3Ware provided Ms. Pairman abides by the surviving terms of her confidentiality agreements and executes a full general release in favor of the Company. If the Company terminates Ms. Pairman's employment due to her disability or she dies while employed by the Company, she or her estate will receive 12 months vesting credit on the stock options assumed by the Company.

In May 2004, the Company entered into an Employment and Non-Solicitation Agreement with Brian Wilkie as Vice President and General Manager of Embedded Products. The agreement provides that Mr. Wilkie will receive an annual base salary of $190,000 and a quarterly bonus of $30,000 for the three-year term of the agreement. Pursuant to the agreement, if the Company terminates Mr. Wilkie's employment without cause or Mr. Wilkie resigns with good reason, the Company will pay him a lump sum severance payment equal to the remaining quarterly bonus amounts that he would have received during the remainder of the term of the agreement provided Mr. Wilkie abides by the surviving terms of his confidentiality agreements and executes a full general release in favor of the Company.

The Company offers a deferred compensation plan to a select group of management or highly compensated employees of the Company to accumulate additional retirement income through a nonqualified deferred compensation plan. The deferred compensation plan enables employees to make a pre-tax elective deferral in excess of those permitted under the Company's 401(k) Plan. The Named Executive Officers are eligible to participate in this plan. In accordance with the terms of the deferred compensation plan, in the case of a change in control, all participants' accounts would be distributed in a lump sum payment as soon as administratively possible. Participants in the deferred compensation plan must elect how their funds will be distributed upon retirement or termination of employment prior to contributing to the plan.

In accordance with the terms of the Company's stock option plans, if the Company enters into certain change-of-control transactions, any option granted to purchase shares of common stock shall vest and become immediately exercisable for the number of shares that would otherwise be vested and exercisable under the terms of the option one year after the date of the change-of-control transaction. This would apply to options granted to any of the Named Executive Officers. The Company's stock option plans provide for a post-termination exercise period upon retirement or termination of employment.

34