Table of Contents

## CERTAIN TRANSACTIONS

During fiscal 2005, the Company chartered aircraft from a charter company for business travel purposes by Company personnel. Often times the particular aircraft that the Company chartered was owned by a company that Mr. Rickey controlled. In fiscal 2005, the Company paid approximately $194,211 to charter this particular aircraft. The Company believes these payments were equal to the charter fees that would have resulted from an arm's length transaction. The Company has discontinued this practice.

The Company has entered into indemnification agreements with its officers and directors containing provisions that may require the Company, among other things, to indemnify its officers and directors against certain liabilities that may arise by reason of their status or service as officers or directors (other than liabilities arising from willful misconduct of a culpable nature) and to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that all of the transactions set forth above were made on terms no less favorable to the Company than could have been obtained from unaffiliated third parties. All future transactions between the Company and its officers, directors, principal stockholders and affiliates will be approved by a majority of the Board, including a majority of the independent and disinterested outside directors on the Board, and will be on terms no less favorable to the Company than could be obtained from unaffiliated third parties.

35

Table of Contents

## PERFORMANCE GRAPH
## COMPARISON OF FIVE-YEAR CUMULATIVE TOTAL RETURN*

The below graph compares the five-year cumulative total return for AMCC common stock with the comparable cumulative return of four indices. The graph assumes $100 invested on March 31, 2000, in AMCC common stock and $100 invested at that same time in each of the other indexes. The comparison assumes that all dividends are reinvested. The stock price performance on the following graph is not necessarily indicative of future stock price performance.



| | 3/31/00 | 3/31/01 | 3/31/02 | 3/31/03 | 3/31/04 | 3/31/05 |
|---|---|---|---|---|---|---|
| Applied Micro Circuits Corporation common stock | $ 100 | $21.99 | $10.66 | $ 4.34 | $ 7.61 | $ 4.37 |
| S&P 500 Total Return Index | 100 | 78.35 | 78.66 | 59.19 | 80.09 | 85.48 |
| Nasdaq National Market Total Return Index | 100 | 40.03 | 40.34 | 29.61 | 43.71 | 44.00 |
| Nasdaq Electronic Components Stocks Industry Index | 100 | 31.29 | 33.21 | 19.15 | 33.40 | 26.71 |
| Nasdaq Telecommunications Stocks Industry Index | 100 | 35.09 | 19.00 | 14.05 | 19.05 | 20.91 |

* This Section is not "soliciting material," is not deemed "filed" with the SEC and is not to be incorporated by reference in any filing of the Company under the 1933 Act or the 1934 Act whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

36

Table of Contents

## CERTAIN MATTERS RELATING TO PROXY MATERIALS AND ANNUAL REPORTS

The SEC has adopted rules that permit companies and intermediaries (e.g., brokers) to satisfy the delivery requirements for proxy statements and annual reports with respect to two or more stockholders sharing the same address by delivering a single proxy statement addressed to those stockholders. This process, which is commonly referred to as "householding," potentially means extra convenience for stockholders and cost savings for companies.

This year, a number of brokers with account holders who are AMCC stockholders will be "householding" the Company's proxy materials. A single proxy statement will be delivered to multiple stockholders sharing an address unless contrary instructions have been received from the affected stockholders. Once you have received notice from your broker that they will be "householding" communications to your address, "householding" will continue until you are notified otherwise or until you revoke your consent. If, at any time, you no longer wish to participate in "householding" and would prefer to receive a separate proxy statement and annual report, please notify your broker. If you are holding a physical stock certificate, direct your written request to Computershare Investor Services, LLC, 2 N La Salle Street, Chicago, IL 60602, telephone number (312) 588-4143. Stockholders who currently receive multiple copies of the proxy statement at their address and would like to request "householding" of their communications should contact their broker or Computershare Investor Services.

## OTHER MATTERS

The Board of Directors knows of no other matters that will be presented for consideration at the annual meeting. If any other matters are properly brought before the meeting, it is the intention of the persons named in the accompanying proxy to vote on such matters in accordance with their best judgment.

By Order of the Board of Directors

Jeffery A. Blazevich
Secretary
July 11, 2005

**A copy of the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year ended March 31, 2005 is available without charge upon written request to: Investor Relations, Applied Micro Circuits Corporation, 6290 Sequence Drive, San Diego, California 92121 or available on line at www.amcc.com.**

37

Table of Contents



## APPENDIX A
### CHARTER OF THE AUDIT COMMITTEE

#### P URPOSE AND P OLICY

The primary purpose of the Audit Committee (the " *Committee* ") shall be to act on behalf of the Board of Directors (the " *Board* ") of Applied Micro Circuits Corporation (the " *Company* ") in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal accounting and financial controls, and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing an audit report or performing other audit services (the " *Auditors* "). The operation of the Committee shall be subject to the Bylaws of the Company as in effect from time to time and Section 141 of the Delaware General Corporation Law.

The policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication among the Committee, the Auditors and the Company's financial management.

#### C OMPOSITION

The Committee shall consist of at least three members of the Board of Directors. The members of the Committee shall satisfy the independence and financial literacy requirements of The Nasdaq Stock Market (" *Nasdaq* ") applicable to Committee members as in effect from time to time, when and as required by Nasdaq, as well as the independence requirements set forth in Exhibit "A" to this Charter. At least one member shall satisfy the applicable Nasdaq financial sophistication requirements as in effect from time to time. The members of the Committee shall be appointed by and serve at the discretion of the Board. Vacancies occurring on the Committee shall be filled by the Board. The Chairman of the Committee shall be designated by the Board.

#### M EETINGS AND M INUTES

The Committee shall hold such regular or special meetings as its members shall deem necessary or appropriate. Minutes of each meeting of the Committee shall be prepared and distributed to each director of the Company and the Secretary of the Company promptly after each meeting. The Chairman of the Committee shall report to the Board from time to time, or whenever so requested by the Board.

#### A UTHORITY

The Committee shall have authority to appoint, determine compensation for, and at the expense of the Company, retain and oversee the Auditors as set forth in Section 10A(m)(2) of the Securities Exchange Act of 1934, as amended, and the rules thereunder and otherwise to fulfill its responsibilities under this Charter. The Committee shall have authority to retain and determine compensation for, at the expense of the Company, special legal, accounting or other advisors or consultants as it deems necessary or appropriate in the performance of its duties. The Committee shall also have authority to pay, at the expense of the Company, ordinary administrative expenses that, as determined by the Committee, are necessary or appropriate in carrying out its duties. The Committee shall have full access to all books, records, facilities and personnel of the Company as deemed necessary or appropriate by any member of the Committee to discharge his or her responsibilities hereunder. The Committee shall have authority to require that any of the Company's personnel, counsel, accountants (including the Auditors) or investment bankers, or any other consultant or advisor to the Company attend any meeting of the Committee or meet with any member of the Committee or any of its special legal, accounting or other advisors

A-1

Table of Contents



and consultants. The approval of this Charter by the Board shall be construed as a delegation of authority to the Committee with respect to the responsibilities set forth herein.

## R ESPONSIBILITIES

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

**1.** To evaluate the performance of the Auditors, to assess their qualifications and to determine whether to retain or to terminate the existing Auditors or to appoint and engage new Auditors for the ensuing year, which retention shall be subject only to ratification by the Company's stockholders (if the Committee or the Board elects to submit such retention for ratification by the stockholders).

**2.** To determine and approve engagements of the Auditors (prior to commencement of such engagements) to perform all proposed audit, review and attest services, including the scope of and plans for the audit, the adequacy of staffing, the compensation to be paid to the Auditors and the negotiation and execution, on behalf of the Company, of the Auditors' engagement letters, which approval may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

**3.** To determine and approve engagements of the Auditors, prior to commencement of such engagements (unless in compliance with exceptions available under applicable laws and rules related to immaterial aggregate amounts of services), to perform any proposed permissible non-audit services, including the scope of the service and the compensation to be paid for such services, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

**4.** To monitor the rotation of the partners of the Auditors on the Company's audit engagement team as required by applicable laws and rules and to consider periodically and, if deemed appropriate, adopt a policy regarding rotation of auditing firms.

**5.** At least annually, to receive and review written statements from the Auditors delineating all relationships between the Auditors and the Company, consistent with Independence Standards Board Standard No. 1, to consider and discuss with the Auditors any disclosed relationships and any compensation or services that could affect the Auditors' objectivity and independence, and to assess and otherwise take appropriate action to oversee the independence of the Auditors.

**6.** To consider and, if deemed appropriate, adopt a policy regarding Committee preapproval of employment by the Company of individuals employed or formerly employed by the Company's Auditors and engaged on the Company's account.

**7.** To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the Securities and Exchange Commission (" *SEC* ") and to recommend whether or not such financial statements should be so included.

A-2

Table of Contents

**AMCC**

**8.** To review with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

**9.** To review with management and the Auditors the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

**10.** To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**11.** To review with management and the Auditors, as appropriate, earnings press releases.

**12.** To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles (" *GAAP* ") related to material items discussed with management and any other significant reporting issues and judgments.

**13.** To review with management (or without management present, as the Committee deems appropriate) and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and significant claims made on the Company's insurance policies, and the steps taken by management to monitor and control these exposures.

**14.** To review significant actual and potential litigation claims with the Company's General Counsel, any other officer of the Company responsible for such claims, and/or outside counsel engaged by the Company to represent the Company with respect to such claims, and the steps taken to resolve such claims.

**15.** To evaluate the cooperation received by the Auditors during their audit examination, including any significant difficulties with the audit or any restrictions on the scope of their activities or access to required records, data and information, significant disagreements with management and management's response, if any.

**16.** To review with the Auditors and, if appropriate, management, any management or internal control letter issued or, to the extent practicable, proposed to be issued by the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

**17.** To review with the Auditors, as appropriate, communications between the audit team and the firm's national office with respect to accounting or auditing issues presented by the engagement.

**18.** To review with management and the Auditors (or any other registered public accounting firm) any conflicts or disagreements between management and the Auditors (or such firm) regarding financial reporting, accounting practices or policies and to resolve any such conflicts or disagreements regarding financial reporting.

**19.** To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of financial reporting controls in effect including any special audit steps taken in the event of material control deficiencies.

Table of Contents



**20.** Periodically, to meet in separate sessions with the Auditors and management to discuss any matters that the Committee, the Auditors or management believe should be discussed privately with the Committee.

**21.** To consider and review with management, the Auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

**22.** To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

**23.** To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

**24.** To review with counsel, the Auditors and management, as appropriate, any significant regulatory or other legal or accounting initiatives or matters that may have a material impact on the Company's financial statements.

**25.** To determine and approve engagements of any registered public accounting firm (in addition to the Auditors) to perform any review or attest service, including the compensation to be paid to such firm and the negotiation and execution, on behalf of the Company, of such firm's engagement letter, which approval may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

**26.** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and approval of related-party transactions as required by Nasdaq rules.

**27.** To prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

**28.** To review and assess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

**29.** To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the performance or independence of the Company's Auditors, or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

**30.** To review, discuss and assess the Committee's own performance at least annually.

**31.** To perform such other functions and to have such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing.

It shall be the responsibility of management to prepare the Company's financial statements and periodic reports and the responsibility of the Auditors to audit those financial statements. These functions shall not be the responsibility of the Committee, nor shall it be the Committee's responsibility to ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP or otherwise comply with applicable laws.

A-4

Table of Contents



## EXHIBIT "A"
## INDEPENDENCE REQUIREMENTS

To meet the independence standards of this Exhibit A, the Board must determine that a director satisfies all of the following criteria:

**1.** The director has not been employed by the Company or its subsidiaries as an Executive Officer at any time during the preceding five years. "Executive Officer" means the Chief Executive Officer and the "named executive officers", as defined in Item 402(a)(3) of Regulation S-K of the SEC;

**2.** The director or an entity affiliated with the director has not received, during the current fiscal year or any of the three immediately preceding fiscal years, remuneration of more than $50,000 in any such fiscal year for service as an advisor, consultant, or legal counsel to the Company or to an Executive Officer of the Company; *provided, however,* that compensation for service as a director of the Company shall not be included for purposes of this paragraph (2);

**3.** The director has no personal services contract(s) with the Company or any Executive Officer of the Company, which result in payments of more than $50,000 in any such fiscal year; *provided, however,* that service as a director of the Company shall not be deemed to constitute a personal services contract for purposes of this paragraph (3);

**4.** The director is not an officer, director or trustee of a not-for-profit entity that receives cash contributions from the Company or an Executive Officer of the Company in an amount greater than the greater of $250,000 or 1% of that not-for-profit entity's total annual receipts;

**5.** During the current fiscal year or any of the three immediately preceding fiscal years, the director has not had any business relationship with the Company for which the Company has been required to make disclosure under Item 404 of Regulation S-K of the SEC, other than for service as a director or for which relationship no more than de minimis remuneration was received in any one such year;

**6.** The director is not employed by a public company at which an Executive Officer of the Company serves as a director;

**7.** The director is not a member of the immediate family of any person described in paragraphs (1), (2), (3) or (4) above;

**8.** The director does not have beneficial ownership interest greater than 5% of the total equity interest in an entity that has received remuneration, other than de minimis remuneration, from the Company or its subsidiaries. Remuneration is deemed de minimis for this paragraph only if it does not exceed the greater of $2,000,000 or 1% of the entity's consolidated annual gross revenues and does not directly result in an increase in the compensation received by the director from that entity; and

**9.** The director is not a current Executive Officer of a significant customer or supplier of AMCC. A customer is significant if, during the fiscal year, it made payments of more than the greater of $1,000,000 or 2% of the consolidated annual gross revenues of the Company and a supplier is significant if, during the fiscal year, it received more than the greater of $1,000,000 or 2% of the consolidated annual gross revenues of the Company.

Table of Contents

In accordance with the Instructions to Item 10 of Schedule 14A, the following written plan document is being filed with the Securities and Exchange Commission in electronic format as an appendix to the proxy statement of Applied Micro Circuits Corporation for its 2005 Annual Meeting of Stockholders.

Table of Contents

## APPLIED MICRO CIRCUITS CORPORATION
## 1998 EMPLOYEE STOCK PURCHASE PLAN

### Amended May 19, 2005 [1]

The following constitute the provisions of the 1998 Employee Stock Purchase Plan of Applied Micro Circuits Corporation (the "Plan").

1. Purpose . The purpose of the Plan is to provide employees of the Company and its Designated Subsidiaries with an opportunity to purchase Common Stock of the Company. It is the intention of the Company to have the Plan qualify as an "Employee Stock Purchase Plan" under Section 423 of the Internal Revenue Code of 1986, as amended. The provisions of the Plan shall, accordingly, be construed so as to extend and limit participation in a manner consistent with the requirements of that section of the Code.

2. Definitions .

(a) " Board " shall mean the Board of Directors of the Company.

(b) " Code " shall mean the Internal Revenue Code of 1986, as amended.

(c) " Common Stock " shall mean the Common Stock of the Company.

(d) " Company " shall mean Applied Micro Circuits Corporation, a Delaware corporation.

(e) " Compensation " shall mean all base straight time gross earnings including payments for overtime, shift premium, sales department commissions/bonus plan, but excluding all other bonuses and reimbursements.

(f) " Continuous Status as an Employee " shall mean the absence of any interruption or termination of service as an Employee. Continuous Status as an Employee shall not be considered interrupted in the case of a leave of absence agreed to in writing by the Company, provided that such leave is for a period of not more than 90 days or reemployment upon the expiration of such leave is guaranteed by contract or statute.

(g) " Contributions " shall mean all amounts credited to the account of a participant pursuant to the Plan.

(h) " Designated Subsidiaries " shall mean the Subsidiaries which have been designated by the Board from time to time in its sole discretion as eligible to participate in the Plan.

(i) " Employee " shall mean any person, including an Officer, who is customarily employed for at least twenty (20) hours per week and more than five (5) months in a calendar year by the Company or one of its Designated Subsidiaries.

---

[1]    Subject to stockholder approval.

1.

Table of Contents

(j) " Exchange Act " shall mean the Securities Exchange Act of 1934, as amended.

(k) " Purchase Date " shall mean the last day of each Purchase Period of the Plan.

(l) " Offering Date " shall mean the first business day of each Offering Period of the Plan.

(m) " Offering Period " shall mean, for Offering Periods beginning before February 1, 2001, a period of twelve (12) months, and for Offering Periods beginning on or after February 1, 2001, a period of twenty-four (24) months, commencing on February 1 and August 1 of each year, except for the first Offering Period as set forth in Section 4(a) and as otherwise determined by the Board of Directors with respect to any particular Offering Period.

(n) " Officer " shall mean a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(o) " Plan " shall mean this Employee Stock Purchase Plan.

(p) " Purchase Period " shall mean a period of six (6) months within an Offering Period, except for the first Purchase Period as set forth in Section 4(b).

(q) " Purchase Price " shall mean an amount equal to 85% of the Fair Market Value of a share of Common Stock as defined in Section 7(b) on the Offering Date or on the Purchase Date, whichever is lower, provided, however, that, in the event (i) the Company's stockholders approve an increase in the number of shares available for issuance under the Plan, and (ii) all or a portion of such additional shares are to be issued with respect to one or more Offering Periods that are underway at the time of such stockholder approval ("Additional Shares"), and (iii) the Fair Market Value of a share of Common Stock on the date of such approval (the "Approval Date Fair Market Value") is higher than the Fair Market Value on the Offering Date for any such Offering Period, then in such instance the Purchase Price with respect to Additional Shares shall be 85% of the Approval Date Fair Market Value or the Fair Market Value of a share of Common Stock on the Purchase Date, whichever is lower.

(r) " Subsidiary " shall mean a corporation, domestic or foreign, of which not less than 50% of the voting shares are held by the Company or a Subsidiary, whether or not such corporation now exists or is hereafter organized or acquired by the Company or a Subsidiary.

3. Eligibility .

(a) Any person who is an Employee as of the Offering Date of a given Offering Period shall be eligible to participate in such Offering Period under the Plan, subject to the requirements of Section 5(a) and the limitations imposed by Section 423(b) of the Code.

(b) Any provisions of the Plan to the contrary notwithstanding, no Employee shall be granted an option under the Plan (i) if, immediately after the grant, such Employee (or

2.

Table of Contents

any other person whose stock would be attributed to such Employee pursuant to Section 424(d) of the Code) would own stock and/or hold outstanding options to purchase stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or of any subsidiary of the Company, or (ii) if such option would permit his or her rights to purchase stock under all employee stock purchase plans (described in Section 423 of the Code) of the Company and its Subsidiaries to accrue at a rate which exceeds Twenty-Five Thousand Dollars ($25,000) of fair market value of such stock (determined at the time such option is granted) for any calendar year in which such option is outstanding at any time.

    4. Offering Periods and Purchase Periods .

        (a) Offering Periods . The Plan shall be implemented by a series of Offering Periods with new Offering Periods commencing on or about February 1 and August 1 of each year (or at such other time or times as may be determined by the Board of Directors). Except as otherwise determined by the Board of Directors, Offering Periods beginning before February 1, 2001 shall be of twelve (12) months duration, and Offering Periods beginning on or after February 1, 2001 shall be of twenty-four (24) months duration. The first Offering Period shall commence on the date that the Company's stockholders first approve the Plan and will continue until July 31, 1999. The Plan shall continue until terminated in accordance with Section 19 hereof. The Board of Directors of the Company shall have the power to change the duration and/or the frequency of Offering Periods with respect to future offerings without shareholder approval if such change is announced at least fifteen (15) days prior to the scheduled beginning of the first Offering Period to be affected. Eligible employees may not participate in more than one Offering Period under the Plan at a time.

        (b) Purchase Periods . Except as otherwise determined by the Board of Directors, each Offering Period beginning before February 1, 2001 shall consist of two (2) consecutive purchase periods of six (6) months duration, and each Offering Period beginning on or after February 1, 2001 shall consist of four (4) consecutive purchase periods of six (6) months duration. The last day of each Purchase Period shall be the "Purchase Date" for such Purchase Period. A Purchase Period commencing on February 1 shall end on the next July 31. A Purchase Period commencing on August 1 shall end on the next January 31. The first Purchase Period shall commence on the date that the Plan is first approved by the Company's stockholders and shall end on January 31, 1999. The Board of Directors of the Company shall have the power to change the duration and/or frequency of Purchase Periods with respect to future purchases without shareholder approval if such change is announced at least fifteen (15) days prior to the scheduled beginning of the first Purchase Period to be affected.

    5. Participation .

        (a) An eligible Employee may become a participant in the Plan by completing a subscription agreement on the form provided by the Company and filing it with the Company's payroll office prior to the applicable Offering Date, unless a later time for filing the subscription agreement is set by the Board for all eligible Employees with respect to a given offering. The subscription agreement shall set forth the percentage of the participant's Compensation (which shall be not less than 1% and not more than 20%) to be paid as Contributions pursuant to the Plan.

3.

Table of Contents

(b) Payroll deductions shall commence on the first payroll following the Offering Date and shall end on the last payroll paid on or prior to the last Purchase Period of the Offering Period to which the subscription agreement is applicable, unless sooner terminated by the participant as provided in Section 10.

6. Method of Payment of Contributions .

(a) At the time a participant files his or her subscription agreement, the participant shall elect to have payroll deductions made on each payday during the Offering Period in an amount not less than one percent (1%) and not more than twenty percent (20%) of such participant's Compensation on each such payday. All payroll deductions made by a participant shall be credited to his or her account under the Plan. A participant may not make any additional payments into such account.

(b) A participant may discontinue his or her participation in the Plan as provided in Section 10, or, during the Offering Period may increase or decrease the rate of his or her Contributions during such Offering Period by completing and filing with the Company a new subscription agreement; provided, however, that no participant may effect more than one increase or decrease during a Purchase Period. The change in rate shall be effective as of the beginning of the next pay period following the date of filing of the new subscription agreement, if the agreement is filed at least ten (10) business days prior to such date and, if not, as of the beginning of the next succeeding pay period.

(c) Notwithstanding the foregoing, to the extent necessary to comply with Section 423(b)(8) of the Code and Section 3(b) herein, a participant's payroll deductions may be decreased to 0% at such time during any Offering Period as is necessary to comply with the limitations provided in such Sections. Payroll deductions shall re-commence at the rate provided in such participant's subscription Agreement at such time as will comply with such Sections, unless terminated by the participant as provided in Section 10.

7. Grant of Option .

(a) On the Offering Date of each Offering Period, each eligible Employee participating in such Offering Period shall be granted an option to purchase on each Purchase Date a number of shares of the Company's Common Stock determined by dividing such Employee's Contributions accumulated prior to such Purchase Date and retained in the participant's account as of the Purchase Date by the applicable Purchase Price; provided however, that the maximum number of shares an Employee may purchase during each Purchase Period shall be 4,000 shares, and provided further that such purchase shall be subject to the limitations set forth in Sections 3(b) and 13. The fair market value of a share of the Company's Common Stock shall be determined as provided in Section 7(b).

(b) The fair market value of the Company's Common Stock on a given date shall be determined by the Board in its discretion based on the closing price of the Common Stock for such date (or, in the event that the Common Stock is not traded on such date, on the immediately preceding trading date), as reported by the National Association of Securities Dealers Automated Quotation (Nasdaq) National Market or, if such price is not reported, the

4.

Table of Contents

mean of the bid and asked prices per share of the Common Stock as reported by Nasdaq or, in the event the Common Stock is listed on a stock exchange, the fair market value per share shall be the closing price on such exchange on such date (or, in the event that the Common Stock is not traded on such date, on the immediately preceding trading date), as reported in The Wall Street Journal; *provided, however,* that for Offering Periods beginning on or after April 18, 2001, the fair market value of the Company's Common Stock on the first day of each such Offering Period shall be determined by the Board in its discretion based on the closing price of the Common Stock on the last market trading day prior to such date, as reported by the National Association of Securities Dealers Automated Quotation (Nasdaq) National Market or, if such price is not reported, the mean of the bid and asked prices per share of the Common Stock as reported by Nasdaq or, in the event the Common Stock is listed on a stock exchange, the fair market value per share shall be the closing price on such exchange on the last market trading day prior to such date, as reported in The Wall Street Journal (the "Fair Market Value").

8. Exercise of Option . Unless a participant withdraws from the Plan as provided in paragraph 10, his or her option for the purchase of shares will be exercised automatically on each Purchase Date of an Offering Period, and the maximum number of full shares subject to the option will be purchased at the applicable Purchase Price with the accumulated Contributions in his or her account. The shares purchased upon exercise of an option hereunder shall be deemed to be transferred to the participant on the Purchase Date. No fractional shares shall be purchased. Any payroll deductions accumulated in a participant's account which are not sufficient to purchase a full share shall be retained in the participant's account for the subsequent Purchase Period or Offering Period, subject to earlier withdrawal by the participant as provided in Section 10. Any other monies left over in a participant's account after a Purchase Date, including amounts that would have purchased shares in excess of the maximum allowed under Section 7(a), shall be returned to the Participant. During his or her lifetime, a participant's option to purchase shares hereunder is exercisable only by him or her.

9. Delivery . As promptly as practicable after each Purchase Date of each Offering Period, the Company shall arrange the delivery to each participant, as appropriate, of a certificate representing the shares purchased upon exercise of his or her option or the deposit of such number of shares with the broker selected by the Company for administration of Plan stock purchases, as determined by the Company.

10. Voluntary Withdrawal; Termination of Employment .

(a) A participant may withdraw all but not less than all of the Contributions credited to his or her account under the Plan at any time at least five (5) business days prior to each Purchase Date by giving written notice to the Company in the form provided for by the Company. All of the participant's Contributions credited to his or her account will be paid to him or her promptly after receipt of his or her notice of withdrawal and his or her option for the current period will be automatically terminated, and no further Contributions for the purchase of shares will be made during the Offering Period.

(b) Upon termination of the participant's Continuous Status as an Employee (as defined in Section 2(f) hereof) prior to the Purchase Date of an Offering Period for any reason, including retirement or death, the Contributions credited to his or her account will be returned to him or her or, in the case of his or her death, to the person or persons entitled thereto under Section 14, and his or her option will be automatically terminated.

5.

(c) In the event an Employee fails to remain in Continuous Status as an Employee of the Company for at least twenty (20) hours per week during the Offering Period in which the employee is a participant, he or she will be deemed to have elected to withdraw from the Plan and the Contributions credited to his or her account will be returned to him or her and his or her option terminated.

(d) A participant's withdrawal from an offering will not have any effect upon his or her eligibility to participate in a succeeding offering or in any similar plan which may hereafter be adopted by the Company.

11. Automatic Withdrawal . If the Fair Market Value of the shares on a Purchase Date during an Offering Period (other than the last Purchase Date of such Offering Period) is less than the Fair Market Value of the shares on the Offering Date for such Offering Period, then every participant shall automatically (i) be withdrawn from such Offering Period at the close of such Purchase Date and after the acquisition of shares for such Purchase Period, and (ii) be enrolled in the Offering Period commencing on the first business day subsequent to such Purchase Period.

12. Interest . No interest shall accrue on the Contributions of a participant in the Plan.

13. Stock .

(a) The maximum number of shares of the Company's Common Stock which shall be made available for sale under the Plan shall be 19,200,000 shares subject to adjustment upon changes in capitalization of the Company as provided in Section 19. If the total number of shares which would otherwise be subject to options granted pursuant to Section 7(a) on the Offering Date of an Offering Period exceeds the number of shares then available under the Plan (after deduction of all shares for which options have been exercised or are then outstanding), the Company shall make a pro rata allocation of the shares remaining available for option grant in as uniform a manner as shall be practicable and as it shall determine to be equitable. In such event, the Company shall give written notice of such reduction of the number of shares subject to the option to each Employee affected thereby and shall similarly reduce the rate of Contributions, if necessary.

(b) The participant will have no interest or voting right in shares covered by his or her option until such option has been exercised.

(c) Shares to be delivered to a participant under the Plan will be registered in the name of the participant or in the name of the participant and his or her spouse.

14. Administration . The Board, or a committee named by the Board, shall supervise and administer the Plan and shall have full power to adopt, amend and rescind any rules deemed desirable and appropriate for the administration of the Plan and not inconsistent with the Plan, to construe and interpret the Plan, and to make all other determinations necessary or advisable for the administration of the Plan. The composition of the committee shall be in accordance with the requirements to obtain or retain any available exemption from the operation of Section 16(b) of the Exchange Act pursuant to Rule 16b-3 promulgated thereunder.

6.

Table of Contents

15. Designation of Beneficiary .

    (a) A participant may file a written designation of a beneficiary who is to receive any shares and cash, if any, from the participant's account under the Plan in the event of such participant's death subsequent to the end of a Purchase Period but prior to delivery to him or her of such shares and cash. In addition, a participant may file a written designation of a beneficiary who is to receive any cash from the participant's account under the Plan in the event of such participant's death prior to the Purchase Date of an Offering Period. If a participant is married and the designated beneficiary is not the spouse, spousal consent shall be required for such designation to be effective.

    (b) Such designation of beneficiary may be changed by the participant (and his or her spouse, if any) at any time by written notice. In the event of the death of a participant and in the absence of a beneficiary validly designated under the Plan who is living at the time of such participant's death, the Company shall deliver such shares and/or cash to the executor or administrator of the estate of the participant, or if no such executor or administrator has been appointed (to the knowledge of the Company), the Company, in its discretion, may deliver such shares and/or cash to the spouse or to any one or more dependents or relatives of the participant, or if no spouse, dependent or relative is known to the Company, then to such other person as the Company may designate.

16. Transferability . Neither Contributions credited to a participant's account nor any rights with regard to the exercise of an option or to receive shares under the Plan may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will, the laws of descent and distribution, or as provided in Section 15) by the participant. Any such attempt at assignment, transfer, pledge or other disposition shall be without effect, except that the Company may treat such act as an election to withdraw funds in accordance with Section 10.

17. Use of Funds . The Company may use all Contributions received or held by the Company under the Plan for any corporate purpose, and the Company shall not be obligated to segregate such Contributions.

18. Reports . Individual accounts will be maintained for each participant in the Plan. Statements of account will be given to participating Employees promptly following the Purchase Date, which statements will set forth the amounts of Contributions, the per share purchase price, the number of shares purchased and the remaining cash balance, if any.

19. Adjustments Upon Changes in Capitalization; Corporate Transactions .

    (a) Adjustment . Subject to any required action by the shareholders of the Company, the number of shares of Common Stock covered by each option under the Plan which has not yet been exercised and the number of shares of Common Stock which have been authorized for issuance under the Plan but have not yet been placed under option (collectively, the "Reserves"), as well as the price per share of Common Stock covered by each option under the Plan which has not yet been exercised, shall be proportionately adjusted for any increase or

7.

Table of Contents

decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration". Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issue by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an option.

     (b) Corporate Transactions . In the event of the proposed dissolution or liquidation of the Company, the Offering Period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board. In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, each option under the Plan shall be assumed or an equivalent option shall be substituted by such successor corporation or a parent or subsidiary of such successor corporation, unless the Board determines, in the exercise of its sole discretion and in lieu of such assumption or substitution, to shorten the Offering Period then in progress by setting a new Purchase Date (the "New Purchase Date"). If the Board shortens the Offering Period then in progress in lieu of assumption or substitution in the event of a merger or sale of assets, the Board shall notify each participant in writing, at least ten (10) days prior to the New Purchase Date, that the Purchase Date for his or her option has been changed to the New Purchase Date and that his or her option will be exercised automatically on the New Purchase Date, unless prior to such date he or she has withdrawn from the Offering Period as provided in Section 10. For purposes of this paragraph, an option granted under the Plan shall be deemed to be assumed if, following the sale of assets or merger, the option confers the right to purchase, for each share of option stock subject to the option immediately prior to the sale of assets or merger, the consideration (whether stock, cash or other securities or property) received in the sale of assets or merger by holders of Common Stock for each share of Common Stock held on the effective date of the transaction (and if such holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares of Common Stock); provided, however, that if such consideration received in the sale of assets or merger was not solely common stock of the successor corporation or its parent (as defined in Section 424(e) of the Code), the Board may, with the consent of the successor corporation and the participant, provide for the consideration to be received upon exercise of the option to be solely common stock of the successor corporation or its parent equal in fair market value to the per share consideration received by holders of Common Stock and the sale of assets or merger.

     The Board may, if it so determines in the exercise of its sole discretion, also make provision for adjusting the Reserves, as well as the price per share of Common Stock covered by each outstanding option, in the event that the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or reductions of shares of its outstanding Common Stock, and in the event of the Company being consolidated with or merged into any other corporation.

8.

Table of Contents

20. Amendment or Termination .

(a) The Board of Directors of the Company may at any time and for any reason terminate or amend the Plan. Except as provided in Section 19, no such termination may affect options previously granted, provided that an Offering Period may be terminated by the Board on a Purchase Date if the Board determines that the termination of the Plan is in the best interests of the Company and the shareholders or if continuation of an Offering Period would cause the Company to incur adverse accounting charges resulting from a change in the generally accepted accounting rules applicable to such plans. Except as provided in Section 19, no amendment may make any change in any option theretofore granted which adversely affects the rights of any participant. In addition, to the extent necessary to comply with Rule 16b-3 under the Exchange Act, or under Section 423 of the Code (or any successor rule or provision or any applicable law or regulation), the Company shall obtain shareholder approval in such a manner and to such a degree as so required.

(b) Without shareholder consent and without regard to whether any participant rights may be considered to have been adversely affected, the Board (or its committee) shall be entitled to change the Offering Periods and Purchase Periods, limit the frequency and/or number of changes in the amount withheld during an Offering Period, establish the exchange ratio applicable to amounts withheld in a currency other than U.S. dollars, permit payroll withholding in excess of the amount designated by a participant in order to adjust for delays or mistakes in the Company's processing of properly completed withholding elections, establish reasonable waiting and adjustment periods and/or accounting and crediting procedures to ensure that amounts applied toward the purchase of Common Stock for each participant properly correspond with amounts withheld from the participant's Compensation, and establish such other limitations or procedures as the Board (or its committee) determines in its sole discretion advisable which are consistent with the Plan.

21. Notices . All notices or other communications by a participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

22. Conditions Upon Issuance of Shares . Shares shall not be issued with respect to an option unless the exercise of such option and the issuance and delivery of such shares pursuant thereto shall comply with all applicable provisions of law, domestic or foreign, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, and the requirements of any stock exchange upon which the shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an option, the Company may require the person exercising such option to represent and warrant at the time of any such exercise that the shares are being purchased only for investment and without any present intention to sell or distribute such shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned applicable provisions of law.

9.

Table of Contents

23. Term of Plan; Effective Date . The Plan shall become effective upon the earlier to occur of its adoption by the Board of Directors or its approval by the shareholders of the Company. It shall continue in effect for a term of twenty (20) years unless sooner terminated under Section 20.

24. Additional Restrictions of Rule 16b-3 . The terms and conditions of options granted hereunder to, and the purchase of shares by, persons subject to Section 16 of the Exchange Act shall comply with the applicable provisions of Rule 16b-3. This Plan shall be deemed to contain, and such options shall contain, and the shares issued upon exercise thereof shall be subject to, such additional conditions and restrictions as may be required by Rule 16b-3 to qualify for the maximum exemption from Section 16 of the Exchange Act with respect to Plan transactions.

10.

Table of Contents

# APPLIED MICRO CIRCUITS CORPORATION

## 1998 EMPLOYEE STOCK PURCHASE PLAN
## SUBSCRIPTION AGREEMENT

___Original Application
___Change in Payroll Deduction Rate
___Change in Beneficiary(ies)                                                    Offering Date _____

1. I, _____, hereby elect to participate in the APPLIED MICRO CIRCUITS CORPORATION 1998 Employee Stock Purchase Plan (the "Plan") for the Offering Period beginning on _____, and subscribe to purchase shares of the Company's Common Stock in accordance with this Subscription Agreement and the Plan.

2. I elect to have Contributions in the amount of _____% of my Compensation, as those terms are defined in the Plan, applied to this purchase. I understand that this amount must not be less than 1% and not more than 20% of my Compensation during the Offering Period. (Please note that no fractional percentages are permitted).

3. I hereby authorize payroll deductions from each paycheck during the Offering Period at the rate stated in Item 2 of this Subscription Agreement. I understand that all payroll deductions made by me shall be credited to my account under the Plan and that I may not make any additional payments into such account. I understand that all payments made by me shall be accumulated for the purchase of shares of Common Stock at the applicable purchase price determined in accordance with the Plan. I further understand that, except as otherwise set forth in the Plan, shares will be purchased for me automatically on the Purchase Date of each Offering Period unless I otherwise withdraw from the Plan by giving written notice to the Company for such purpose.

4. I understand that I may discontinue at any time prior to the Purchase Date my participation in the Plan as provided in Section 10 of the Plan. I also understand that I can increase or decrease the rate of my Contributions to not less than 1% and to not more than 20% of my Compensation on one occasion only for an increase in the rate and on one occasion only for a decrease in the rate during any Purchase Period by completing and filing a new Subscription Agreement. Such increase or decrease will take effect as of the beginning of the calendar month following the date of filing of the new Subscription Agreement, if filed at least five (5) business days prior to the beginning of such month. Further, I may change the rate of deductions for future Offering Periods by filing a new Subscription Agreement, and any such change will be effective as of the beginning of the next Offering Period. In addition, I acknowledge that, unless I discontinue my participation in the Plan as provided in Section 10 of the Plan, my election will continue to be effective for each successive Offering Period.

1.

**Table of Contents**

5. I have received a copy of the Company's most recent description of the Plan and a copy of the complete "APPLIED MICRO CIRCUITS CORPORATION 1998 Employee Stock Purchase Plan." I understand that my participation in the Plan is in all respects subject to the terms of the Plan.

6. I understand that shares purchased for me under the Plan will be issued and deposited with Salomon Smith Barney, where an account will be automatically established for me as a plan participant.

7. In the event of my death, I hereby designate the following as my beneficiary(ies) to receive all payments and shares due to me under the Plan:

NAME: (Please print)

_____

(First)        (Middle)        (Last)

_____

(Relationship)

(Address)

8. I understand that if I dispose of any shares received by me pursuant to the Plan within 2 years after the Offering Date (the first day of the Offering Period during which I purchased such shares) or within 1 year after the Purchase Date, I will be treated for federal income tax purposes as having received ordinary compensation income at the time of such disposition in an amount equal to the excess of the fair market value of the shares on the Purchase Date over the price which I paid for the shares, regardless of whether I disposed of the shares at a price less than their fair market value at the Purchase Date. The remainder of the gain or loss, if any, recognized on such disposition will be treated as capital gain or loss.

I hereby agree to notify the Company in writing within 30 days after the date of any such disposition, and I will make adequate provision for federal, state or other tax withholding obligations, if any, which arise upon the disposition of the Common Stock . The Company may, but will not be obligated to, withhold from my compensation the amount necessary to meet any applicable withholding obligation including any withholding necessary to make available to the Company any tax deductions or benefits attributable to the sale or early disposition of Common Stock by me.

9. If I dispose of such shares at any time after expiration of the 2-year and 1-year holding periods, I understand that I will be treated for federal income tax purposes as having received compensation income only to the extent of an amount equal to the lesser of (1) the excess of the fair market value of the shares at the time of such disposition over the purchase price which I paid for the shares under the option, or (2) 15% of the fair market value of the shares on the Offering Date. The remainder of the gain or loss, if any, recognized on such disposition will be treated as capital gain or loss.

2.

Table of Contents

I understand that this tax summary is only a summary and is subject to change . I further understand that I should consult a tax advisor concerning the tax implications of the purchase and sale of stock under the Plan.

10. I hereby agree to be bound by the terms of the Plan. The effectiveness of this Subscription Agreement is dependent upon my eligibility to participate in the Plan.

SIGNATURE: _____

SOCIAL SECURITY #: _____

DATE: _____

SPOUSE'S SIGNATURE (necessary
if beneficiary is not spouse):

_____

(Signature)

_____

(Print name)

3.

Table of Contents

### APPLIED MICRO CIRCUITS CORPORATION

### 1998 EMPLOYEE STOCK PURCHASE PLAN

### NOTICE OF WITHDRAWAL

I, _____ _____ ___, hereby elect to withdraw my participation in the APPLIED MICRO CIRCUITS CORPORATION 1998 Employee Stock Purchase Plan (the "Plan") for the Offering Period _____. This withdrawal covers all Contributions credited to my account and is effective on the date designated below.

I understand that all Contributions credited to my account will be paid to me within ten (10) business days of receipt by the Company of this Notice of Withdrawal and that my option for the current period will automatically terminate, and that no further Contributions for the purchase of shares can be made by me during the Offering Period.

The undersigned further understands and agrees that he or she shall be eligible to participate in succeeding offering periods only by delivering to the Company a new Subscription Agreement.

Dated: ___ _____

_____
Signature of Employee

_____
Social Security Number

Table of Contents

### APPLIED MICRO CIRCUITS CORPORATION
### 6290 SEQUENCE DRIVE
### SAN DIEGO, CA 92121

    The Annual Meeting of Stockholders of Applied Micro Circuits Corporation, a Delaware corporation (the "Company"), will be held at the principal offices of the Company, located at 6290 Sequence Drive, San Diego, California, 92121 on Tuesday, August 23, 2005, at 10:00 a.m., local time, for the purposes stated on the reverse side. The undersigned hereby appoints Kambiz Y. Hooshmand and Jeffery A. Blazevich, or either of them, as proxies, each with the power to appoint his substitute, and hereby authorizes them to represent and to vote as designated below all of the shares of Common Stock of Applied Micro Circuits Corporation that the undersigned is entitled to vote at the Annual Meeting of Stockholders.

THIS PROXY WHEN PROPERLY EXECUTED WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED STOCKHOLDER. IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION TO THE BOARD OF DIRECTORS OF EACH OF THE NOMINEES LISTED ON THE REVERSE SIDE AND FOR PROPOSALS 2 AND 3. IF ANY OTHER MATTER IS PROPERLY PRESENTED AT THE ANNUAL MEETING, THIS PROXY WILL BE VOTED IN THE BEST JUDGMENT OF THE PROXIES.

PLEASE MARK, SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY USING THE ENCLOSED REPLY ENVELOPE.

(CONTINUED AND TO BE SIGNED ON THE REVERSE SIDE)

Table of Contents

*APPLIED MICRO CIRCUITS CORPORATION LOGO*
*6290 SEQUENCE DRIVE*
*SAN DIEGO, CA 92121*

**VOTE BY INTERNET**— *www.proxyvote.com*
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE SHAREHOLDER COMMUNICATIONS**
If you would like to reduce the costs incurred by Applied Micro Circuits Corporation in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access shareholder communications electronically in future years.

**VOTE BY PHONE—1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign, and date your proxy card and return it in the postage-paid envelope we have provided or return it to Applied Micro Circuits Corporation, c/o ADP, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:                AMCCO1       KEEP THIS PORTION FOR YOUR RECORDS
_____
DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

**APPLIED MICRO CIRCUITS CORPORATION**

**THE GOVERNANCE AND NOMINATING COMMITTEE RECOMMENDS A VOTE "FOR" EACH OF THE NOMINEES LISTED UNDER ITEM 1**

1.  To elect as Directors of Applied Micro Circuits Corporation the nominees listed below.

| | | For All | Withhold | For All | To withhold authority to vote, mark "For All Except" and write |
| | | **All** | **All** | **Except** | the nominee's number on the line below. |

| | | | |
|---|---|---|---|
| 01) Cesar Cesaratto | 05) Arthur B. Stabenow | ☐  ☐  ☐ | _____ |
| 02) Murray A. Goldman | 06) Julie H. Sullivan | | |
| 03) Kambiz Y. Hooshmand | 07) Harvey P. White | | |
| 04) Roger A. Smullen, Sr. | 08) David B. Wright | | |

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ITEM 2**

|  |  | For | Against | Abstain |
|---|---|---|---|---|
| 2. | To amend the 1998 Employee Stock Purchase Plan to increase the number of shares of common stock authorized for issuance under the plan by 8,000,000 shares. | ☐ | ☐ | ☐ |

**THE AUDIT COMMITTEE RECOMMENDS A VOTE "FOR" ITEM 3**

|  |  | For | Against | Abstain |
|---|---|---|---|---|
| 3. | To ratify the selection of Ernst & Young LLP as independent auditors of the Company for the fiscal year ending March 31, 2005. | ☐ | ☐ | ☐ |
| 4. | To conduct any other business properly brought before the meeting. | | | |

These items of business are more fully described in the proxy statement accompanying this proxy card. The record date for the annual meeting is June 27, 2005. Only stockholders of record at the close of business on that date may vote at the meeting or any adjournment thereof.

|  | Yes | No |
|---|---|---|
| Please indicate if you plan to attend this meeting | ☐ | ☐ |

Signature [PLEASE SIGN WITHIN BOX]          Date          Signature (Joint Owners)          Date

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.