# Exhibit C

LEXSEE 2007 U S DIST LEXIS 14532

ANDREW E. ROTH, Plaintiff, v. GREGORY REYES, et al., Defendants.

No. C 06-02786 CRB

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2007 U.S. Dist. LEXIS 14532*

February 13, 2007, Decided
February 13, 2007, Filed

**DISPOSITION:** The court granted defendants' motion to dismiss without prejudice.

**COUNSEL:** [*1] For Andrew E. Roth, derivatively on behalf of Brocade Communications Systems, Inc, Plaintiff: Willem F. Jonckheer, LEAD ATTORNEY, Robert C. Schubert, Schubert & Reed LLP, San Francisco, CA; Glenn F. Ostrager, Ostrager Chong Flaherty & Broitman P.C., New York, NY; Paul D. Wexler, Bragar Wexler & Eagel, P.C., New York, NY.

For Gregory Reyes, Defendant: Garrett J. Waltzer, LEAD ATTORNEY, Skadden Arps Slate Meagher & Flom, LLP, Palo Alto, CA; Harriet S. Posner, LEAD ATTORNEY, Carl A. Roth, Richard Marmaro, Skadden Arps Slate Meagher & Flom LLP, Los Angeles, CA.

For Michael Byrd, Defendant: Patrick C. Doolittle, LEAD ATTORNEY, John M. Potter, Scott G. Lawson, Quinn Emanuel Urquhart Oliver & Hedges LLP, San Francisco, CA.

For Antonio Canova, Defendant: Norman J. Blears, LEAD ATTORNEY, Alexander M.R. Lyon, Heller Ehrman LLP, Menlo Park, CA; Robin Wechkin, Heller Ehrman LLP, Seattle, WA US.

For Jack Cuthbert, Defendant: Mark Mermelstein, LEAD ATTORNEY, Mark E. Beck, Peter J. Diedrich, Beck, De Corso, Daly, Kreindler & Harris, Los Angeles, CA.

For Brocade Communications System, Inc, Defendant: Katherine Leigh Henderson, Mark Thomas Oakes, Nina F. Locker, Wilson Sonsini [*2] Goodrich & Rosati, Palo Alto, CA.

**JUDGES:** CHARLES R. BREYER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHARLES R. BREYER

**OPINION**

**MEMORANDUM AND ORDER**

This is a derivative action in which Andrew Roth ("Plaintiff"), a shareholder of Brocade Communications Systems, Inc. ("Brocade"), seeks to disgorge approximately $ 230 million in short-swing profits allegedly reaped by Brocade insiders Gregory Reyes, Michael Byrd, Antonio Canova, and Jack Cuthbert (collectively, "Defendants"). Now pending before the Court are Defendants' motions to dismiss the action. Because the Court agrees with Defendants that Plaintiff has not yet adequately stated a claim under Section 16(b) of the Securities and Exchange Act of 1934, *15 U.S.C. § 78p(b)*, their motions to dismiss are hereby GRANTED and the case DISMISSED without prejudice.

**BACKGROUND**

In November of 2005, Brocade announced that it would restate earnings for fiscal years 2001 through 2004. According to Plaintiff, this restatement was due to the fact that Brocade and its senior officers, including Defendants, had "engaged in a scheme to backdate the grant of [stock] options in order to unjustly enrich the recipients." Compl. [*3] P 11. Plaintiff claims that each of the named Defendants received such backdated grants. Id. P 10. He acknowledges that Defendants disclosed aspects of these transactions to the Securities and Exchange Commission ("SEC") and to the public--indeed, he attached Defendants' public filings regarding these stock option grants to his complaint. See id. P 23. But he

Case 3:07-cv-02917-MJJ    Document 10-6    Filed 08/28/2007    Page 3 of 11

Page 2
2007 U.S. Dist. LEXIS 14532, *

alleges that the stock options were not "properly" disclosed because the filings concealed the true date on which they were granted. Id. P 19. He further suggests that these stock options were issued at the unilateral behest of the company's CEO, Gregory Reyes, who acted, allegedly in his own words, as a "committee of one" with respect to certain grants. Id. PP 12, 15.

According to Plaintiff, Defendants sold shares of stock in Brocade within six months of receiving their backdated grants and thereby reaped profits of approximately $ 230 million. Id. PP 23-24. He contends that these sales constitute prohibited short-swing trades under Section 16(b) of the Securities and Exchange Act of 1934 and that the proceeds from these transactions must be returned to the company. See 15 U.S.C. § 78p(b) [*4] .

Defendants respond that the stock options granted by Brocade, whether backdated or not, are exempt from the strictures of Section 16(b). They further argue that, even if Plaintiff has stated a valid claim for disgorgement, his claim is barred by the statute's two-year limitations period.

## DISCUSSION

Section 16(a) of the 1934 Act imposes a reporting requirement on the "directors, officers, and principal stockholders" of a public corporation. 15 U.S.C. § 78p(a). Under this provision, such insiders must file a report with the SEC whenever they acquire or dispose of stock in the company. Id. Applicable SEC regulations require "beneficial owners" covered by Section 16(a) to submit a "Form 4" to report any changes in their ownership of the company within two days of such transactions. See 17 C.F.R. §§ 240.16a-3(a), (g). Similarly, the SEC requires all insiders to file a year-end report, called a "Form 5," which sets forth all acquisitions and dispositions of company stock. Id. §§ 240.16a-3(a), (f). These filing requirements thus provide public notice of all insider stock transactions.

Section 16(b) prohibits short-swing [*5] insider trading. "For the purpose of preventing the unfair use of [inside] information," it imposes a blanket prohibition on the short-term purchase and subsequent sale--or the sale and subsequent purchase--of stock by certain individuals who are considered insiders under the securities laws. 15 U.S.C. § 78p(b). If an insider conducts such a pair of transactions within a six-month period, Section 16(b) deems the transactions illegal per se, and the insider must remit any profits gained therefrom to the company. As the Supreme Court has explained:

> Congress sought to "curb the evils of insider trading by taking the profits out of a class of transactions in which it believed the possibility of abuse was intolerably great." It accomplished this by defining directors, officers, and beneficial owners as those presumed to have access to inside information and enacting a flat rule that a corporation could recover the profits these insiders made on a pair of securities transactions within six months.

Foremost-McKesson, Inc. v. Provident Sec. Co., 423 U.S. 232, 243-44, 96 S. Ct. 508, 46 L. Ed. 2d 464 (1976) (quoting Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422, 92 S. Ct. 596, 30 L. Ed. 2d 575 (1972)). [*6] Furthermore, Section 16(b) empowers shareholders to file suit on the company's behalf to recoup profits from prohibited short-swing trading. It also provides, however, that "no such suit shall be brought more than two years after the date such profit was realized." 15 U.S.C. § 78p(b).

As with any law that uses a proxy (such as a six-month window) to regulate some perceived correlative evil (such as the exploitation of non-public information by corporate insiders), Section 16(b) is both underbroad and overbroad. It is underbroad in the sense that it fails to reach all of the conduct it targets; after all, insiders can still exploit their access to non-public information through trades that occur more than six months apart. Conversely, it is overbroad in the sense that it captures some benign conduct; after all, not every pair of trades executed within a span of six months exploits non-public information. See Dreiling v. Am. Express Co., 458 F.3d 942, 947 (9th Cir. 2006).

To mitigate the problem of overbreadth, Congress has permitted the SEC to create exceptions to the blanket prohibition on short-term insider trading. Thus, Section 16(b) states: [*7] "This subsection shall not be construed to cover . . . any transaction or transactions which the [SEC] by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b). In other words, Congress has allowed the SEC to place certain types of insider transactions beyond the reach of Section 16(b) if the agency concludes that the transactions do not pose a risk of being exploited by insiders to profit from non-public information.

Pursuant to this statutory grant of authority, the SEC promulgated 17 C.F.R. § 240.16b-3 ("Rule 16b-3"). This regulation lists the types of transactions that the SEC has deemed permissible, notwithstanding the fact that they may produce a profit that would otherwise be subject to forfeiture under Section 16(b). The exemption relevant to this case, Rule 16b-3(d), pertains to stock issued to insiders by companies themselves. Prior to 1996, this rule

Case 3:07-cv-02917-MJJ   Document 10-6   Filed 08/28/2007   Page 4 of 11

Page 3
2007 U.S. Dist. LEXIS 14532, *

exempted only stock issued to insiders as compensation. Now, the rule exempts all such issuer-to-insider transfers, regardless of their purpose, so long as the company's shareholders or board of directors approves [*8] them, or the transferred stock is retained by the insider for more than six months. *Rule 16b-3(d)* states:

> Any transaction . . . involving an acquisition from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose, shall be exempt if:
>
> (1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;
>
> (2) The transaction is approved or ratified, in compliance with *Section 14* of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; provided that such ratification occurs no later than the date of the next annual meeting of shareholders; or
>
> (3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such [*9] acquisition, provided that this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercises or conversion) or its underlying equity security.

It is worthwhile to note that, as with the statute itself, this regulation also employs a proxy. That is, just as *Section 16(b)* uses the proxy of a flat ban on short-swing trading to prevent the exploitation of inside information, *Rule 16b-3(d)* likewise uses the proxy of an issuer-to-insider transaction to fine-tune the statute and exempt transactions that, according to the SEC, do not raise the same danger that inside information will be used unfairly.

The legal framework surrounding *Section 16(b)* thus comprises a set of overlapping proxies whose cumulative effect--one hopes--is to curtail more effectively the exploitation of non-public information by corporate insiders. This proxy-upon-proxy method of regulation is not foolproof, however. As the Ninth Circuit recently noted, *Section 16(b)* does not provide "an airtight solution" to the problem of insider trading. [*10] *Dreiling, 458 F.3d at 950*. Nor does the statute require the SEC's regulations to be airtight. Indeed, in a recent decision sustaining the SEC's enactment of *Rule 16b-3(d)*, the Ninth Circuit emphasized that it would be "inconsistent with the statute," and incompatible with the deference owed by courts to regulatory agencies, to require the SEC to tailor its regulations perfectly to the perceived evil of trading on inside information. Id. As the unanimous panel in Dreiling explained: "The relevant question is whether *Rule 16b-3(b)* exempts transactions for which the risk of speculative abuse is *intolerable*," not whether "the transactions exempted from *[Section 16(b)]* pose absolutely no risk of speculative abuse." Id.

## DISCUSSION

The central question presented by this case is whether Defendants' allegedly backdated grants are within the scope of *Section 16(b)* and therefore subject to its ban on short-swing trading. Defendants contend they are not. Defendants maintain that their stock options are exempt from the statute's prohibition by virtue of *Rule 16b-3*, which provides that transfers of stock from a company to its insiders, as opposed to purchases [*11] of stock by insiders on the market, generally are not subject to the strictures of *Section 16(b)*. In response, Plaintiff advances two arguments. First, he suggests that an exemption is unavailable in the case of backdated options because backdating is not "consistent with legiti-

Case 3:07-cv-02917-MJJ   Document 10-6   Filed 08/28/2007   Page 5 of 11

Page 4
2007 U.S. Dist. LEXIS 14532, *

mate corporate purposes." Compl. P 17. Second, he argues that an exemption is unavailable because Reyes granted the backdated options in question as a "committee of one," which in his view indicates that Brocade's Board of Directors "abdicated its responsibility to oversee the options grants." Id. P 16.

Another question raised by the case is whether Plaintiff's lawsuit is timely, given that the two-year statute of limitations set forth in *Section 16(b)* has expired. See *15 U.S.C. § 78p(b)* (stating that "no such suit [for disgorgement of short-swing profits] shall be brought more than two years after the date such profit was realized"). Although this case presents an interesting question about the proper application of *Section 16(b)*'s limitations period, the Court finds it unnecessary here to resolve the issue of timeliness.[1] Instead, the Court holds that, even if Plaintiff [*12] were entitled to equitable tolling of the two-year statute of limitations, he has nonetheless failed to allege facts that would bring the allegedly backdated stock options grants within *Section 16(b)*'s prohibition on short-swing trading.

> 1  Plaintiff concedes, as he must, that the challenged transactions occurred more than two years prior to the date on which he filed this lawsuit. Nonetheless, Plaintiff contends that he is entitled to equitable tolling of the statute of limitations because Defendants failed to disclose material facts regarding the nature of the transactions. See *Whittaker v. Whittaker Corp., 639 F.2d 516, 528 (9th Cir.)* (concluding that "tolling of the two year time period is required when the pertinent [disclosures] are not filed"), cert. denied, *454 U.S. 1031, 102 S. Ct. 566, 70 L. Ed. 2d 473 (1981)*. None of the cases cited by Plaintiff, however, directly supports his position. In all published cases involving equitable tolling of *Section 16(b)*, courts tolled the statute because insiders had failed to report their transactions *at all*. See id. at 527-30; see also *Litzler v. CC Invs., L.D.C., 362 F.3d 203, 208 (2d Cir. 2004)*; *Dreiling v. Am. Exp. Travel Related Services Co., Inc., 351 F. Supp. 2d 1077, 1082-83 (W.D. Wash. 2004)*, rev'd on other grounds, *458 F.3d 942 (9th Cir. 2006)*; *Tristar Corp. v. Freitas, 84 F.3d 550, 553-54 (2d Cir. 1996)*; *Rosen ex rel. Egghead.Com, Inc. v. Brookhaven Capital Mgmt. Co., 179 F. Supp. 2d 330, 337-38 (S.D.N.Y. 2002)*; *Morales v. Exec. Telecard, Ltd., 1998 U.S. Dist. LEXIS 8839, 1998 WL 314734, at *2-3 (S.D.N.Y. June 12, 1998)*; *Blau v. Albert, 157 F. Supp. 816, 818 (S.D.N.Y. 1957)*.
>
> By contrast, in this case, Defendants *did* report their transactions. Indeed, Plaintiff attached to his complaint the very forms that Defendants filed years ago in putative compliance with *Section 16(a)* and applicable SEC regulations. Thus, unlike every other case of equitable tolling of which this Court is aware, in this case Plaintiff cannot claim that he did not know the insiders had acquired or disposed of company stock. His argument is not that Defendants concealed the transactions, but instead that they concealed *the true nature* of the transactions.

This case thus presents a legal question apparently not yet addressed by any federal court: whether a shareholder is entitled to equitable tolling of the statute of limitations in *Section 16(b)*, when the insider discloses the transaction as required by *Section 16(a)*, but the shareholder subsequently discovers undisclosed information about the character of the transaction that provides notice, for the first time, of the basis for a disgorgement claim? As to that question, the cases provide little guidance. Contrary to Defendants' assertions, the Ninth Circuit's decision in Whitaker does not supply a ready answer. In that case, the Ninth Circuit adopted a "disclosure" standard for tolling, meaning that the clock begins to run only after the insider "discloses the transactions at issue in his mandatory *[Section] 16(a)* reports." *Id. at 527*. To say that the clock starts running upon "disclosure," however, is merely to beg the question: upon the disclosure of what? In Whitaker, the defendants had made no disclosures whatsoever, and the assumption implicit in the Ninth Circuit's decision is that disclosures would have put shareholders on notice of their possible claims. Simply put, the Ninth Circuit provided no discussion of, and obviously gave no thought to, how to apply the statute of limitations in the case of *inaccurate* or *misleading* disclosures. That the Ninth Circuit did not anticipate the problem of misleading disclosures is evident from the fact that, as applied to this case, the two justifications offered by the Whitaker court for the so-called "disclosure" standard point in opposite directions. On the one hand, running the clock upon the filing of any *Section 16(a)* disclosure, accurate or not, would still provide "clear boundaries" and "a limitations period which can be mechanically calculated from objective facts." Id. On the other hand, starting the clock upon the filing of a misleading disclosure directly undermines the statute's principal goal of allowing shareholders disgorge improper short-swing profits. Id. The danger of subverting the statute's purpose is especially serious in a case such as this one, where the company itself is a party to the

Case 3:07-cv-02917-MJJ   Document 10-6   Filed 08/28/2007   Page 6 of 11

Page 5
2007 U.S. Dist. LEXIS 14532, *

challenged transaction and shareholders are the only plaintiffs likely to challenge it. For these reasons, *Whitaker* does not provide clear instruction about what type of "disclosure" is sufficient to start the running of the statute of limitations where, as here, a shareholder sues under *Section 16(b)* upon the belatedly discovery that an insider deliberately concealed and misrepresented information in his *Section 16(a)* filings.

Plaintiff argues that tolling is appropriate when insiders fail to identify the actual nature of the transactions they make. After all, it is one thing to make disclosures that put potential plaintiffs on notice of their possible claims; it is another thing to make disclosures that obfuscate such claims. Indeed, enforcing the statute of limitations in this case would arguably permit insiders to immunize themselves from punishment as to one form of corporate misconduct (*i.e.,* reaping short-swing profits) by engaging in another (*i.e.,* disguising those profits). Then again, as Defendants argue, tolling the statute of limitations in cases like this one would render the two-year time limit nearly meaningless. In effect, shareholders would forever be allowed to bring a lawsuit if they could learn of some undisclosed fact-- *any* fact--on which they could rely to claim that the previously disclosed transaction is not actually exempt from the ban on short-swing trading. After all, the law requires an insider only to disclose the type of transaction at issue and to state whether it is covered under *Section 16(b)*'s ban on short-swing trading. See *15 U.S.C. § 78p(a)(3)(B)*; *17 C.F.R. § 240.16a-3(g)(1)*; see also SEC, Statement of Changes in Beneficial Ownership of Securities -- General Instructions 8-9 (2005), http://www.sec.gov/about/forms/form4data.pdf (last visited Jan. 18, 2007) (requiring an insider to identify only "the character of the transaction reported"). Thus, if a shareholder may bring a suit, notwithstanding the two-year statute of limitations, based on some aspect of the transaction not described by the insider in his SEC filings, then shareholders effectively have an inextinguishable right to challenge the validity of a claimed exemption.

The arguments on both sides of this dispute are forceful. Fortunately, the Court need not resolve the issue now. As explained above, even if Plaintiff were entitled to equitable tolling, he has failed to allege that the information not disclosed by the Brocade insiders is of a character that would render Defendants' transactions subject to the ban on short-swing trading under *Section 16(b)*.

[*13] A. Backdating

In the context of a motion to dismiss, this Court must accept as true Plaintiff's allegation that each of the grants received by Defendants was backdated. *Huynh v. Chase Manhattan Bank, 465 F.3d 992, 997 (9th Cir. 2006)*. Nonetheless, this Court rejects Plaintiff's contention that stock options are necessarily subject to disgorgement under *Section 16(b)* if insiders misrepresent the date on which their options are granted.

Simply put, backdating is irrelevant to *Section 16(b)*. SEC regulations exempt *any* issuer-to-insider transfers of company stock "whether or not intended for a compensatory or other purpose" as long as one of three conditions is met: (1) the transaction is approved by the board of directors, (2) the transaction is approved by the shareholders, or (3) the recipient of the grant holds the stock for at least six months. *17 C.F.R. § 240.16b-3(d)*. In this Court's view, this exemption applies exactly when it says it does, regardless of whether the grants are backdated. The statute says nothing of backdating, and this Court declines to impose an additional gate-keeping requirement for issuer-to-insider [*14] transactions where the SEC has not. In Dreiling, the Ninth Circuit rejected the contention that SEC's regulations is invalid because it may, under certain circumstances allow for abuse, and noted that courts "may not invalidate the rule simply because [a party] questions the policy underpinnings of *Rule 16b-3(d)*." *458 F.3d at 951*. This Court finds that the same logic applies here.

Plaintiff urges the Court to hold that backdated grants cannot qualify for an exemption under *Rule 16b-3(d)* because they are not "legitimate transactions." Pl's Consol. Mem. of P. & A. in Opp. to Mot. to Dismiss at 8-15. He argues that the statutory scheme is "obviously intended for *bona fide,* legitimate corporate transactions, not for a scheme by statutory insiders to fraudulently enrich themselves." Id. at 9-10. He contends that fraudulent transactions, such as backdated grants, therefore cannot qualify for an exemption under SEC rules. Such a "bizarre" result, he argues, would be contrary to the statute's and regulations' purpose of curbing improper insider transactions. Id. at 10. Moreover, he argues, even if the SEC had intended to provide an exemption for backdated transaction, [*15] the agency would not have had power to do so, since the statute itself authorizes the SEC to pass only regulations that are consistent with the statute's general purpose of eradicating improper insider activity. Id. at 14-15 (citing *15 U.S.C. § 78p(b)*).

While it is tempting to construe *Section 16(b)* and *Rule 16b-3* as applying only to "legitimate" transactions,

Case 3:07-cv-02917-MJJ   Document 10-6   Filed 08/28/2007   Page 7 of 11

Page 6
2007 U.S. Dist. LEXIS 14532, *

this Court cannot accept Plaintiff's proposed construction of the law. First, Plaintiff interprets the purpose of *Section 16(b)* too broadly. Congress enacted this statute not for the general purpose of forcing insiders to behave well, but rather "[f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." *15 U.S.C. § 78p(b)*. In other words, the statute is designed primarily to prevent insiders from using information to which investors do not have access. By virtue of their position within the company, officers and directors necessarily know about the forthcoming release of their company's new product; about the fact that their company's quarterly earnings [*16] will fall short of Wall Street's expectations; about a government agency's decision to regulate their company's products or approve its patents; about their company's decision to settle pending litigation on favorable terms; or about their company's decision to acquire, merge with, or sell itself to other companies. Because insiders know such information before other investors do, it is possible for them more accurately to predict, and thereby to profit from, fluctuations in the price of their company's stock. Congress enacted *Section 16(b)* to ensure that all investors in the stock market are playing on a level field.

It was in recognition of this discrete purpose that the SEC issued *Rule 16b-3(d)*. According to the SEC, transfers of stock from a company to an insider "do not appear to present the same opportunities for insider profit on the basis of non-public information as do market transactions by officers and directors." *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, 61 Fed. Reg. 30,376, 30,377 (June 14, 1996). As the SEC explained in enacting the rule, "where the issuer, rather than trading markets, is on the other side of an [*17] officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute." Id.

*Rule 16b-3(d)* thus represents an indication from the SEC that, in the agency's view, a company's decision to give stock to its officers does not present a danger of the type "comprehended within the purpose of" *Section 16(b)*. *15 U.S.C. § 78p(b)*. This is not to say that issuer-to-insider transactions present *no* risk of speculative abuse, nor to say that a grant of stock options is necessarily lawful if it comports with one of the three conditions set forth in *Rule 16b-3*. Rather, it is to say that grants of stock options, backdated or not, do not entail an "intolerably great" risk that insiders will exploit inside information for their own profit. *Dreiling, 458 F.3d at 950* (quoting *Reliance Electric, 404 U.S. at 422*). To be clear, by backdating stock options, a company clearly exploits a certain type of information--to wit, information about how the market behaved yesterday. And it is only by virtue of their [*18] position within the company that insiders are able to exploit this hindsight and grant themselves more profitable options. But the information exploited is not itself *inside* information, and therefore, even though Defendants may have used their privileged position for their own benefit, or for the benefit of other employees, (or even, arguably, for the company's benefit), their conduct does not implicate the specific danger that Congress sought to mitigate with *Section 16(b)*. To expand the reach of *Section 16(b)* to encompass all "illegitimate" transactions, even assuming that courts could correctly and consistently discern which transactions are "legitimate" and which are not, would transform *Section 16(b)* into an all-purpose prohibition on undesirable stock transactions by officers and directors. Such an expansion is unwarranted in light of the more limited purpose explicitly articulated by Congress in the statute's very text.

Second, Plaintiff's suggested interpretation of the law is inconsistent with the structure of *Section 16(b)* and the regulations issued by the SEC under that statute. As noted above, the law in this area regulates by proxy. Congress could have prohibited [*19] outright any transactions in which insiders exploit information not available to the public or takes advantage of their position as corporate officers. For obvious reasons, Congress did not write the law this way; instead, it prohibited short-swing trading "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information." *Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595, 93 S. Ct. 1736, 36 L. Ed. 2d 503 (1973)*; see also *Reliance Electric, 404 U.S. at 422* (noting that Congress "chose a relatively arbitrary rule capable of easy administration" in order to avoid "difficulties in proof" (quoting *Bershad v. McDonough, 428 F.2d 693, 696 (7th Cir. 1970)*)).

Indeed, the Supreme Court has specifically and repeatedly rejected the notion that *Section 16(b)* and the regulations issued under it should be construed to encompass all undesirable insider transactions. See *Foremost-McKesson, 423 U.S. at 252* (noting that the statute must be interpreted to effect the purpose of the statute, but warning that "serving the congressional purpose does not require resolving every ambiguity in favor [*20] of liability"); *Kern County Land Co., 411 U.S. at 594-95* (advising courts "to implement congressional objectives without extending the reach of the statute beyond its intended limits"); *Reliance Electric, 404 U.S. at 422* (noting that the statute "[does] not reach every transaction in which an investor actually relies on inside information," and emphasizing that courts should consider only "whether the method used to 'avoid' liability is one per-

Case 3:07-cv-02917-MJJ   Document 10-6   Filed 08/28/2007   Page 8 of 11

Page 7
2007 U.S. Dist. LEXIS 14532, *

mitted by the statute"). In the same vein, the Ninth Circuit recently rejected the notion that *Section 16(b)* must be interpreted so as to capture all undesirable conduct. In a decision upholding the validity of *Rule 16b-3(d)*, the court recognized that the SEC need not ensure that exempted transactions pose "zero risk of speculative abuse." *Dreiling, 458 F.3d at 950*. In other words, courts must take the good with the bad in applying these proxies. In this sense, the law contemplates its own inadequacy--at least some undesirable insider activity is bound to escape its grasp, since by design, *Section 16(b)* and the regulations passed by the SEC do not directly circumscribe the perceived evil of [*21] insider trading, much less purport to prohibit all forms of bad corporate behavior. To interpret *Section 16(b)* as encompassing all "illegitimate" transactions, regardless of the exemptions set forth by the SEC, would be inconsistent with the design of the system that Congress and the SEC have constructed. This system may be imperfect, but imperfection is inevitable in a system that regulates by proxy, and a court is not entitled to remedy such imperfections in a manner that is at odds with the system itself.

In sum, the Court rejects Plaintiff's suggestion that Defendants' stock options are ineligible for an exemption under *Rule 16b-3* because they may have been backdated. Taken to its logical conclusion, Plaintiff's argument is simply that *Section 16(b)* must encompass all "illegitimate" or "fraudulent" transactions. That assertion is unsupported by the text of *Section 16(b)* or applicable SEC rules, which say nothing of backdating or "illegitimacy." Such an approach is contrary to the legal framework that governs insider transactions, which uses, for better or worse, a system of overlapping and imperfect proxies. And it demands and a far broader application of *Section 16(b)* than a [*22] responsible reading of the statute's purpose --which is to prevent the exploitation of inside information--would support. For these reasons, the Court rejects Plaintiff's primary theory of liability and holds that the backdating of stock options does not *ipso facto* render those transactions subject to the ban on short-swing trading under *Section 16(b)*.

The Court's conclusion that backdating alone does not suffice to bring the transactions within the scope of *Section 16(b)* should not be read as an indication that backdating is appropriate, or that it is legal. As Defendants themselves note, there are a host of other securities laws that prohibit deception or fraud, and the backdating of stock options may well fall under the umbrella of one of those laws. Indeed, other shareholders have sued Brocade and several of its officers under precisely those laws; the SEC is pursuing an enforcement action against the company and its officers; and the Department of Justice has filed criminal charges against two of Brocade's officers. Of course, the Court draws no conclusion here about the applicability of these other laws or the scope Defendants' liability under them. Admittedly, the fact [*23] that other regulations may prohibit backdating is irrelevant to the question of whether *Section 16(b)* does as well. See *Foremost-McKesson, 423 U.S. at 255* ("*Section 16(b)*'s scope, of course, is not affected by whether alternative sanctions might inhibit the abuse of inside information."); *Dreiling, 458 F.3d at 952* ("It is true that the mere existence of other legal remedies for insider trading is irrelevant to determining whether a particular class of transactions should be exempt from *§ 16(b)* liability."). Nonetheless, the observation that other laws more accurately address the type of misconduct implicated by backdating does suggest that *Section 16(b)* should not be pressed into service whenever insiders behave badly, and that Plaintiff is attempting to fit a square peg into a round hole.

### B. A "Committee of One"

Plaintiff's second theory of liability is that Defendants are ineligible for an exemption under *Section 16(b)* because Gregory Reyes, Brocade's CEO, acted as a "committee of one" with respect to the backdated options. In support of this theory, Plaintiff points to a *Business Week* article in which Reyes was quoted as saying that [*24] a member of Brocade's Board of Directors suggested giving him unilateral authority to issue stock option grants. Compl. P 12. According to Plaintiff, this article indicates that the Board of Directors "abdicated its responsibility to oversee the stock option grants." Id. On the basis of this article and the alleged delegation of authority to Reyes, Plaintiff further claims that Brocade's Board "did not properly approve the option grants." Id. P 15.

Unlike the allegations of backdating, these committee-of-one allegations specifically relate to the requirements of *Rule 16b-3(d)*. Here, Defendants claim that their options are exempt from *Section 16(b)* because Brocade's Board of Directors ratified them. See *17 C.F.R. § 240.16b-3(d)(1)* (stating that an issuer-to-insider transaction "shall be exempt without condition" if it is "approved by the board of directors of the issuer"). The very applicability of the exemption thus hinges on the manner in which the grants were administered. If, as the complaint hints, the Board of Directors never actually approved the grants, then under the strict letter of the regulation, the claimed exemption is unavailable. [*25] The Court thus holds that a shareholder may maintain a claim under *Section 16(b)* based on the theory that an issuer transferred stock to an insider without complying with the requirements of *Rule 16b-3(d)*.

The Court further holds, however, that Plaintiff has not set forth sufficient allegations to maintain such a claim here. Fatal to his claim is the absence of an allega-

Case 3:07-cv-02917-MJJ   Document 10-6   Filed 08/28/2007   Page 9 of 11

Page 8
2007 U.S. Dist. LEXIS 14532, *

tion that Brocade's Board of Directors actually failed to approve the backdated grants. Instead, he has alleged only that Reyes acted, at a Board member's suggestion, as a "committee of one" in dispensing the grants. Compl. P 15. From this allegation, Plaintiff extrapolates that the Board of Directors "abdicated its responsibility to oversee the options grants," id. P 12, and "did not *properly* approve the grants," id. P 15 (emphasis added). While these vague insinuations might suggest that Brocade's Board never actually approved the grants, a closer look at the complaint dispels this inference. A failure to exercise oversight is not the same thing as a failure to approve. And an allegation that the Board did not *properly* approve the grants is a legal conclusion, rather than a factual allegation that [*26] the Board never gave its blessing to the backdated transactions. The lack of a factual allegation regarding the Board's approval is most evident from Paragraphs 15 and 16 in the complaint. There, Plaintiff artfully suggests in one breath that Reyes' conduct as a "committee of one" is enough to demonstrate the Board's misconduct, id. P 15, but in the very next breath, Plaintiff argues that "*even if the Board itself had approved the options grants,* it may not do so in [a] bad faith or a fraudulent manner," id. P 16 (emphasis added). The complaint itself is thus equivocal and inadequate in its allegations regarding the Brocade Board of Directors; in the Court's view, the only plausible interpretation of the uncertainty reflected in Paragraphs 15 and 16 is that Plaintiff is merely drawing the inference that the Board abdicated its oversight role (which is not pertinent to the application of *Rule 16b-3(d)*), not that the Board never approved the grants (which is).

In the Court's view, Plaintiff has not alleged, as he must to maintain his claim under *Section 16(b)*, that the Board of Directors failed to comply with the SEC's gatekeeping requirements under *Rule 16b-3(d)*. Unless [*27] and until Plaintiff can set forth allegations that the Board of Directors actually failed to approve the stock options, whether backdated or not, he has failed to satisfy the heightened pleading requirements applicable to his claim.[2]

> 2 The parties dispute whether the notice pleading requirements of *Rule 8* or the heightened pleading requirements of *Rule 9(b)* should govern this lawsuit. Plaintiff correctly maintains that notice pleading generally applies to an action under *Section 16(b)*. But an action under *Section 16(b)* generally involves no aspect of fraud. Instead, as the Second Circuit has stated, in the usual claim for disgorgement, "an insider's short-swing profits will be discovered without any investigation other than the putting together of two and two." *Litzler, 362 F.3d at 208.* In cases such as this one, where the Plaintiff's theory of liability hinges on alleged misrepresentations by the insiders in their *Section 16(a)* disclosures, the Court agrees with Defendants that the more rigorous standard of *Rule 9* applies. See *In re Daou Sys., 411 F.3d 1006, 1027 (9th Cir. 2006)* (holding that "a plaintiff may nonetheless be subject to *Rule 9(b)*'s particularity mandate if his complaint 'sounds in fraud,'" even if his cause of action "does not contain an element of fraud" (citing *Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103-04 (9th Cir. 2003)*, and *In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1404-05 (9th Cir. 1996))).*

[*28] **CONCLUSION**

If Congress had wanted *Section 16(b)* to reach all nefarious insider transactions, it could have done so by expressly articulating that expansive idea in the statute. That is not what Congress has done. Instead, for reasons related to the difficulty of defining, detecting, and policing the improper use of inside information, as well as for the clarity that results from concrete rules, it has employed a system of proxies designed to minimize the evil of improper insider trading. Whatever the merits of this regulatory scheme, it is not for the courts to tinker with it whenever the proxies fail to deter undesirable conduct. Because the scheme enacted by Congress and the SEC, at least as currently written, does not establish liability for the backdating of stock options, the Court concludes that an allegation of backdating is insufficient to state a claim under *Section 16(b)*.

Nonetheless, the Court agrees with Plaintiff that a shareholder may maintain a suit under *Section 16(b)* by alleging that a company has failed to comply with the SEC's requirements regarding exemptions for issuer-to-insider transactions under *Rule 16b-3(d)*. Unfortunately for Plaintiff, he has failed [*29] to make allegations sufficient to sustain a claim under this theory of liability. Defendants' motions to dismiss are therefore GRANTED without prejudice.[3] Plaintiff is hereby given leave to file an amended complaint if he can make allegations, consistent with *Rule 11*, to support his theory that the exemptions set forth under *Rule 16b-3(d)* are inapplicable to Defendants' stock options due to the Board's failure to approve them. An amended complaint shall be filed not later than April 30, 2007.

> 3 Because it is unclear to the Court whether Plaintiff can set forth an allegation that the Board of Directors failed to ratify Defendants' grants, the Court reserves its opinion on (1) Defendant Reyes' theory that his grants are exempt from *Section 16(b)* because he did not exercise his stock options within six months of receiving them, (2) Defendant Byrd's theory that his grants

are not subject to liability under *Section 16(b)* because they were cancelled, and (3) Defendant Cuthbert's theory that he is excused from liability under *Section 16(b)* because of his good-faith reliance on certain SEC rules. If and when an amended complaint is filed, Defendants may renew their objections on these grounds and the Court will consider them.

[*30] **IT IS SO ORDERED.**

Dated: February 13, 2007

CHARLES R. BREYER

UNITED STATES DISTRICT JUDGE

100356

\*\*\*\*\*\*\*\*\*\* Print Completed \*\*\*\*\*\*\*\*\*\*

Time of Request: Tuesday, August 28, 2007   17:50:10 EST

Print Number:    1861:44688331
Number of Lines: 433
Number of Pages:

Send To:  BEYER, TOM
          MORRISON & FOERSTER - TRANS
          425 MARKET ST
          SAN FRANCISCO, CA 94105-2406