# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW E. ROTH, | No. C 06-02786 CRB |
| Plaintiff, | **ORDER DISMISSING PLAINTIFF'S SECOND AMENDED COMPLAINT WITH PREJUDICE** |
| v. | |
| GREGORY REYES, et al., | |
| Defendants. | |

This derivative action is an attempt to transform a case about stock options backdating into a case about insider trading. Because Plaintiff's latest complaint, like his last two, rests on an untenable theory of liability, the Court hereby dismisses it with prejudice. For the reasons set forth below, Defendants' motions to dismiss are GRANTED.

## BACKGROUND

Capital markets require a level playing field for all investors. To protect the integrity of the markets, Congress has passed laws designed to prevent "the unfair use of [inside] information." 15 U.S.C. § 78p(b).

It is exceedingly difficult, however, to police the use of non-public information. Recognizing this, Congress chose not to prohibit outright the act of using inside information, but instead to prohibit "short-swing" trading by corporate insiders. In other words, "Congress sought to 'curb the evils of insider trading by taking the profits out of a class of

transactions in which it believed the possibility of abuse was intolerably great.'" Foremost-McKesson, Inc. v. Provident Sec. Co., 423 U.S. 232, 243-44 (1976) (quoting Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422 (1972)).

Congress enacted a ban on short-swing trading in Section 16(b) of the Securities Exchange Act of 1934. This provision prohibits insiders from making a pair of trades on their company's stock within a period of six months. 15 U.S.C. § 78p(b). The prohibition extends to "directors, officers, and principal stockholders." Id. § 78p(a). Shareholders are empowered enforce Section 16(b) by filing a lawsuit on the company's behalf to recoup any profits from prohibited short-swing transactions. Id. § 78p(b). Lawsuits must be filed not later than "two years after the date such profit was realized." Id.

In this case, Plaintiff portrays himself as seeking to disgorge short-swing profits reaped by insiders at Brocade Communications Systems ("Brocade"). The impetus for this action, however, was not a revelation about certain undisclosed purchases or sales of stock by Brocade insiders. Rather, it was an investigation by Brocade into the company's practice of granting stock options--an investigation that led the company in January of 2005 to restate its earnings for the previous four fiscal years. See Second Am. Compl. ¶ 21 (hereinafter "SAC"). Plaintiff alleges that the cause of this restatement was a scheme at Brocade to "backdate" stock options. Id. ¶ 22.

This alleged backdating scheme was the genesis of several other lawsuits, including a criminal indictment against two Brocade executives; a civil enforcement action by the Securities and Exchange Commission; a class action by Brocade shareholders; and another different derivative action. All of these other cases are also now pending before this Court. See SEC v. Byrd, No. 07-4223-CRB (N.D. Cal. filed Aug. 17, 2007); United States v. Reyes, No. CR-06-0556-CRB (N.D. Cal. filed July 20, 2006); SEC v. Reyes, No. C-06-4435-CRB (N.D. Cal. filed July 20, 2006); In re Brocade Commc'ns Sys., Inc. Derivative Litig., No. C-05-2233-CRB (N.D. Cal. filed June 1, 2005); Smajlaj v. Brocade Commc'ns Sys., Inc., No. C-05-02042-CRB (N.D. Cal. filed May 19, 2005).

//

2

The claims presented in this lawsuit, however, are different from the claims of fraud presented in all of those other cases. Here, Plaintiff claims that Gregory Reyes, Michael Byrd, Antonio Canova, and Jack Cuthbert ("Defendants")--all officers of Brocade--received backdated stock options and then sold shares of Brocade within six months of their grants. Plaintiff argues that the Brocade insiders thereby violated Section 16(b). He filed this action to recoup what he perceives as roughly $230 million in illegal short-swing profits.

The problem with Plaintiff's theory is that a transfer of stock options from a company to one of its directors or officers is generally exempt from the ban on short-swing trading. That is, Section 16(b) ignores most of the issuer-to-insider grants like the ones at issue here. Such stock option grants are not "transactions" within the meaning of the statute.

The source of this exemption is Rule 16b-3(d), which the SEC promulgated in 1991 and amended significantly in 1996. 17 C.F.R. § 240.16b-3(d). This regulation reflects the SEC's view that issuer-to-insider grants of stock options typically do not serve as a vehicle for the improper use of inside information. This is not to say that such grants pose no "risk of speculative abuse." Dreiling v. Am. Express Co., 458 F.3d 942, 947 (9th Cir. 2006). The rule simply reflects the SEC's considered judgment that issuer-to-insider grants do not present "the same opportunities for insider profit on the basis of non-public information" because "the issuer, rather than the trading markets, is on the other side of [the] officer or director's transaction." Ownership Reports and Trading by Officers, Directors and Principal Security Holders, 61 Fed. Reg. 30,376, 30.377 (June 14, 1996).

Accordingly, the SEC has exempted issuer-to-insider stock option grants from the ban on short-swing trading because it considers them generally beyond the pale of Section 16(b). See 15 U.S.C. § 78p(b) (excluding as a basis for short-swing liability "any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection"). Although the rationale for the SEC's exemption may not be "airtight," the Ninth Circuit nonetheless has upheld the SEC's rule as a valid exercise of its regulatory power. Dreiling, 458 F.3d at 947-48.

//

3

The SEC's exemption is not absolute, however. Under Rule 16b-3(d), an issuer-to-insider grant is outside the scope of Section 16(b) only under certain circumstances. Specifically, there is no short-swing liability for a stock option grant if it meets one of three conditions:

> (1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;
>
> (2) The transaction is approved or ratified . . . by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; provided that such ratification occurs no later than the date of the next annual meeting of shareholders; or
>
> (3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such acquisition, provided that this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security.

17 C.F.R. § 240.16b-3(d). In other words, issuer-to-insider grants are exempt as long as they are held for a period of six months, are approved by a majority of shareholders, or are approved by the board of directors or an appropriate committee with outside directors.

Here, Defendants invoke the exemption of Rule 16b-3(d)(1), arguing that their grants were all approved by the company's Board of Directors. See 17 C.F.R. § 240.16b-3(d)(1). Twice Plaintiff has tried and failed to plead around the exemption. His original complaint made no mention of Rule 16b-3(d), either explicitly or implicitly, and when a motion to dismiss called his attention to it, Plaintiff promptly withdrew his complaint. After the complaint was amended, Defendants again moved to dismiss. Plaintiff presented two theories why the exemption should not apply.

First, Plaintiff argued that Rule 16b-3(d) was inapplicable to "illegitimate" transactions, such as the allegedly backdated grants issued to the Brocade insiders. He insisted that the SEC's exemption was "obviously intended for *bona fide*, legitimate corporate transactions, not for a scheme by statutory insiders to fraudulently enrich themselves." The Court rejected that theory:

4

While it is tempting to construe Section 16(b) and Rule 16b-3 as applying only to "legitimate" transactions, this Court cannot accept Plaintiff's proposed construction of the law. . . . Congress enacted this statute not for the general purpose of forcing insiders to behave well, but rather "[f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b).

. . . .

To be clear, by backdating stock options, a company clearly exploits a certain type of information--to wit, information about how the market behaved yesterday. And it is only by virtue of their position within the company that insiders are able to exploit this hindsight and [obtain] more profitable options. But the information exploited is not itself *inside* information, and therefore, even though Defendants may have used their privileged position for their own benefit, or for the benefit of other employees, (or even, arguably, for the company's benefit), their conduct does not implicate the specific danger that Congress sought to mitigate with Section 16(b).

To expand the reach of Section 16(b) to encompass all "illegitimate" transactions, even assuming that courts could correctly and consistently discern which transactions are "legitimate" and which are not, would transform Section 16(b) into an all-purpose prohibition on undesirable stock transactions by officers and directors. Such an expansion is unwarranted in light of the more limited purpose explicitly articulated by Congress in the statute's very text.

[Moreover,] Plaintiff's suggested interpretation of the law is inconsistent with the structure of Section 16(b) and the regulations issued by the SEC under that statute. As noted above, the law in this area regulates by proxy. Congress could have prohibited outright any transactions in which insiders exploit information not available to the public or take[] advantage of their position as corporate officers. For obvious reasons, Congress did not write the law this way; instead, it prohibited short-swing trading "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information." Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595 (1973); see also Reliance Electric, 404 U.S. at 422 (noting that Congress "chose a relatively arbitrary rule capable of easy administration" in order to avoid "difficulties in proof" (quoting Bershad v. McDonough, 428 F.2d 693, 696 (7th Cir. 1970))).

. . . .

In this sense, the law contemplates its own inadequacy--at least some undesirable insider activity is bound to escape its grasp, since by design, Section 16(b) and the regulations passed by the SEC do not directly circumscribe the perceived evil of insider trading, much less purport to prohibit all forms of bad corporate behavior. To interpret Section 16(b) as encompassing all "illegitimate" transactions, regardless of the exemptions set forth by the SEC, would be inconsistent with the design of the system that Congress and the SEC have constructed. This system may be imperfect, but imperfection is inevitable in a system that regulates by proxy, and a court is not entitled to remedy such imperfections in a manner that is at odds with the system itself.

1  Roth v. Reyes, No. C-05-2786-CRB, at 8-11 (N.D. Cal. Feb. 13, 2007) (unpublished
2  opinion). The Court concluded that it was bound to apply the exemptions to Section 16(b) as
3  they were written, rather than to impose "impose an additional gate-keeping requirement for
4  issuer-to-insider transactions where the SEC [had] not." Id. at 8. Finally, the Court noted
5  that there are "a host of other securities laws that prohibit deception or fraud," suggesting
6  that the backdating of stock options might well "fall under the umbrella of one of those
7  laws." Id. at 12.

8       Second, Plaintiff argued that the insiders' grants were not exempt from Section 16(b)
9  because Gregory Reyes, Brocade's CEO, had acted as a "committee of one" with respect to
10 the backdating and granting of stock options. Id. at 13 (quoting Am. Compl. ¶ 12). In other
11 words, Plaintiff suggested that the company's Board of Directors had "abdicated its
12 responsibility to oversee the stock option grants" and "did not properly approve the option
13 grants." Id. (quoting Am. Compl. ¶¶ 12, 15). Plaintiff thus insinuated that the approval of
14 Brocade's Board of Directors was illusory and that the exemption invoked by the insiders as
15 a shield really should offer them no protection.

16      Upon examining the complaint, however, the Court concluded that, even if this second
17 theory of liability were valid, Plaintiff had not set forth sufficient allegations regarding the
18 role of Brocade's Board of Directors. "Fatal to his claim," the Court wrote, "is the absence
19 of an allegation that Brocade's Board of Directors actually failed to approve the backdated
20 grants." Id. Specifically, the Court noted that the amended complaint was equivocal in its
21 allegations regarding the Board's role, on the one hand suggesting that the Board "did not
22 *properly* approve the grants," and on the other hand suggesting that the grants were improper
23 "even if the Board itself had approved the grants." Id. at 13-14 (quoting Am. Compl. ¶¶ 15-
24 16). The Court thus dismissed the amended complaint without prejudice, and gave Plaintiff
25 an opportunity to amend his complaint again in order to set forth specific allegations in
26 support of his theory that "the exemptions set forth under Rule 16b-3(d) are inapplicable to
27 Defendants' stock options due to the Board's failure to approve them." Id. at 15.
28 //

6

In April of 2007, Plaintiff filed his second amended complaint. Defendants renewed their motions to dismiss. The question now presented is whether Plaintiff's new allegations are sufficient to state a claim under Section 16(b). The Court concludes they are not.

## DISCUSSION

In his newest complaint, Plaintiff again is fuzzy about the role of the Board of Directors in approving the relevant stock option grants. He alleges that Seth Neiman and Neal Dempsey, outside directors and members of Brocade's Compensation Committee, were responsible for approving stock option grants to Brocade insiders. SAC ¶ 14. He continues:

> None of the Options Grants at issue in this case were approved in advance by the Board or an authorized committee of the Board. Moreover, neither the Board nor an authorized committee of the Board considered the specific transactions and approved them as required by the SEC Rule 16b-3(d)(1). On the contrary, the Board impermissibly delegated the gate-keeping functions of the Rule by placing the fox in charge of the henhouse. Accordingly, the Option Grants are not entitled to the exemption provided by SEC Rule 16 b-3(d)(1).
>
> Nor is it possible that the Board or an authorized committee of the Board could have approved in advance the Option Grants. As evidenced by the Company's successive restatements of its financial statements, the Option Grants were improperly accounted for as though they were granted on dates prior to their actual grant dates with exercise prices equal to the market prices on such dates. . . . Neither the Board nor any committee of the Board knowingly approved in advance backdated options.

Id. ¶¶ 17-18. Such artful language implies that the Board of Directors never actually approved the grants in question. A closer look at the allegations, however, precludes that reading of the complaint.

When the complaint is carefully examined, it is clear that Plaintiff's theory of the case once again rests on backdating. It never directly alleges that Brocade's Board of Directors or a relevant committee actually failed to approve the stock options in question. It states only that the Board did not approve stock options "in advance." Id. ¶ 17. Or it states that the Board never "knowingly approved in advance *backdated* options." Id. ¶ 18 (emphasis added). Or it offers a legal conclusion that the options were not approved "in a manner that satisfied the requisite gate-keeping requirements of the Rule." Id. ¶ 20. Or it describes how executives backdated stock options and then asserts, based entirely on the "circumstances" of backdating, that "the Board did not approve or authorize the Option Grants." Id. ¶ 21-24.

7

These are nothing more than allegations of backdating in semantic disguise. Once again, Plaintiff's theory is that the grants are subject to Section 16(b) because they are backdated, and for no other reason. The shadowy language of the newest complaint purports to focus its allegations on the conduct of the Compensation Committee, which condoned the challenged grants. But all of its adverbs and adjectives beg the same question: why was the Compensation Committee's approval unsatisfactory, unknowing, improper, or not in advance? Each allegation suggests the same answer: because the grants were backdated. Id. ¶ 18 ("Nor is it possible that the Board or an authorized committee of the Board could have approved in advance the Option Grants . . . [because they] were improperly accounted for as though they were granted on dates prior to their actual grant dates . . . ."). The theory of the newest complaint merely bootstraps the backdating theory already presented, and rejected by this Court, in the last complaint.

Plaintiff's main contention is that backdated grants, by their nature, cannot be approved "in advance," as required by Rule 16b-3(d)(1). He argues that allowing an exemption for backdated grants, regardless of whether those grants have been approved, is contrary to the SEC's "gate-keeping requirements," which are designed to ensure that the board or committee "actually considers each specific transaction and that it evidence[s] acknowledgment and accountability as to what it is doing." Brief of the Securities and Exchange Commission as Amicus Curiae in Partial Support of Each Party at 25, Dreiling v. Am. Express Co., 458 F.3d 942 (9th Cir. 2006) (No. 04-35715).

The Court rejects this interpretation of Rule 16b-3(d)(1). First, it is worth noting that this ostensible requirement of "approval in advance" appears nowhere in the text of Rule 16b-3(d)(1), but rather in so-called "adopting releases" issued by the SEC. See, e.g., Ownership Reports and Trading by Officers, Directors and Principal Security Holders, 70 Fed. Reg. 46,080, 46,082 n.32 (Aug. 9, 2005). The Court finds it implausible that unexplained *dicta* in the SEC's adopting releases would somehow implicitly proscribe the granting of backdated stock options. Instead, to the extent that the SEC can even be said to have construed its exemptions as requiring "approval in advance" of executive stock options,

8

the Court reads the SEC's construction as pertaining to the approval *in advance of the insiders' receipt of the stock option*, and not as requiring approval in advance of the date actually listed on the stock option grant. This construction of the exemption is the most plausible reading of the SEC's rule, and in the Court's view, it adequately promotes the SEC's goal of ensuring that the relevant grantor "actually considers each specific transaction" before an insider or executive receives a bundle of stock options. Here, Plaintiff makes no allegation that Compensation Committee failed to acknowledge or accept responsibility for the executive compensation conferred by the challenged grants. Further, there is no allegation that Reyes, Byrd, Canova, or Cuthbert ever *received* a grant before Brocade's Compensation Committee approved it. Accordingly, the Court finds that, on the facts alleged in the second amended complaint, Plaintiff has still failed to plead himself around the exemption set forth in Rule 16b-3(d)(1).[1]

---

[1] "For completeness," Plaintiff remarks in his brief that the exemption set forth under Rule 16b-3(d) is an affirmative defense, and he claims that he "is not obligated to refute this affirmative defense in the Complaint." Pl.'s Corrected Mem. of P. & A. in Opp. to Motions to Dismiss the Second Am. Compl. at 11 n.4. In this respect, Plaintiff's description of the law is anything but complete. As Wright & Miller explain:

> On occasion a plaintiff's complaint will contain allegations that seek to avoid or defeat a potential affirmative defense that he or she anticipates will be included in the responsive pleading; technically this is improper pleading because these allegations are not an integral part of the plaintiff's claim for relief and lie outside his or her burden of pleading. If the attempt to avoid the affirmative defense actually demonstrates the defense's effectiveness, a situation similar to that of a complaint that contains a built-in defense is presented. As a result, the defendant may test the validity of the defense, since it appears on the face of the complaint, by a motion to dismiss or a motion for summary judgment. However, if the plaintiff purports to negative an affirmative defense by way of anticipation but does not admit the effectiveness fo the defense in his pleading, the district court should treat the plaintiff's references to the defense as mere surplusage.

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1276, at 623-24 (3d ed. 2004). Here, Plaintiff candidly concedes the effectiveness of the affirmative defense. SAC ¶ 11 ("*Absent a valid exemption*, a grant of options is deemed to be a purchase of the underlying securities . . . ." (emphasis added)). Indeed, Plaintiff spills most of his ink crafting allegations in an effort to render the SEC's exemptions inapplicable. See id. ¶¶ 12-28 ("No Exemption For The Option Grants"). Having dedicated his amended complaint to explaining why Rule 16b-3(d) does not apply, Plaintiff is hardly in a position to complain about the Court's examination of his theory.

9

Equally unpersuasive is Plaintiff's suggestion that the Rule 16b-3(d)(1) exemption is unavailable because the Compensation Committee "plac[ed] the fox in charge of the henhouse." Id. ¶ 17. What Plaintiff means is that the exemption should not apply because the Compensation Committee delegated its grant-making authority to Gregory Reyes, the company's CEO, to act as a "committee of one" with respect to certain grants. Id. ¶¶ 14-15. Again, this vague allegation is insufficient to state a claim for liability under Section 16(b). Plaintiff does *not* say that the Compensation Committee ever delegated its authority "to approve stock option grants *to Brocade's executives*." Id. ¶ 14. Plaintiff does *not* say that Reyes ever issued stock options unilaterally to Brocade executives. Id. ¶ 14 (alleging that Reyes acted as a committee of one "to grant options *to certain employees*"). And most significantly, Plaintiff does *not* state that Reyes unilaterally granted, or that the Compensation Committee failed to approve, the stock options actually challenged in this lawsuit. Only transactions by Brocade insiders and executives fall under Section 16(b), and Plaintiff makes no claim that any grants to Brocade's executives were not reviewed or approved by the Compensation Committee. Nor, it appears, can Plaintiff make such allegations consistent with Rule 11, having been given an opportunity to amend his complaint to present precisely that allegation. The only plausible inference to be drawn from Plaintiff's delicately worded complaint is that no delegation of authority was made as to the executives' grants challenged here.

## CONCLUSION

This is the third time that Plaintiff has attempted to advance a claim against Brocade insiders to disgorge the profits they reaped from short-swing trading. On the facts alleged, however, the challenged transactions are exempt from the statute under which Plaintiff seeks to impose liability. See 15 U.S.C. § 78p(b); 17 C.F.R. § 240.16b-3(d)(1). For this reason, his second amended complaint is hereby DISMISSED with prejudice.

**IT IS SO ORDERED.**

Dated: August 27, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE